11 P.3d 762 (2000)
AMALGAMATED TRANSIT UNION LOCAL 587, Respondent,
v.
STATE of Washington, Appellant.
Vashon-Maury Island Community Council, Respondent,
v.
State of Washington, Appellant.
City of Bainbridge Island, Respondent,
v.
State of Washington, Appellant.
Tacoma Water, Respondent,
v.
State of Washington, Appellant.
Public Utility District No. 1 of Snohomish County, Respondent,
v.
State of Washington, Appellant.
Port of Whitman County, Respondent,
v.
State of Washington, and the "$30 License Tab" Initiative 695 Committee, Appellants.
Puget Sound Clean Air Agency, Respondent,
v.
State of Washington, Appellant, and
The $30 License Tab Initiative Campaign, Appellant-Intervenor.
No. 69433-8.
Supreme Court of Washington, En Banc.
Argued June 29, 2000.
Decided October 26, 2000.
As Amended November 27, 2000.
*772 Richard Spoonemore, Lonnie Davis, Seattle, Amicus Curiae on Behalf of Conley "Gene" Kincheloe, Josie L. Schindler, Washington Coalition of Citizens.
Bradley Berg, Lori Nomura, Deborah Winter, Seattle, Amicus Curiae on Behalf of Association of Washington Public Association of Washington Housing.
Patrick Schneider, Ramona L. Monroe, Joshua Brower, Seattle, Amicus Curiae on Behalf of League of Women Voters of Washington.
Richard Stephens, Bellevue, James Johnson, Olympia, for Appellant Intervenor.
Christine Gregoire, Attorney General, Jeffrey Goltz, Assistant Attorney General, Olympia, for Appellant State of Washington.
Charles Ford, Portland, OR, Michael Subit, Clifford Freed, Craig Beles, C. Walter *773 Ebell, Seattle; Lane Powell Spears & Lubersky, James Robert, Gwendolyn Klein, Seattle; Mark Bubenik, Asst. City Attorney, Tacoma; Hugh Spitzer, Grover Cleveland, Thomas Ahearne, Seattle; Kyle Branum, Bellevue; Browne & Ressler, Allen Ressler, Seattle; Orrick, Herrington & Sutcliffe, Cynthia Larsen, William Doyle, Margaret Toledo, Sacramento, CA; Preston, Gates & Ellis, Paul Lawrence, Carol Arnold, Robert Ferguson, Seattle; Law Offices of David S. Vogel, David Vogel, Seattle; Michael Gianunzio, Mukilteo; Laurie Halvorson, Seattle; John Hough, Olympia; Short, Cressman & Burgess, Scott Smith, Andrew Maron, Seattle, for Respondents. *763 *764 *765 *766 *767 *768 *769 *770
*771 MADSEN, J.
The respondents in these consolidated cases raised numerous issues regarding the constitutionality and applicability of Initiative 695 (I-695). The King County Superior Court held the initiative unconstitutional under article II, section 1(b), article II, section 19, and article II, section 37, of the Washington State Constitution. The State of Washington (State) and Intervenor $30 License Tab Initiative Campaign (Campaign) appeal, contending that I-695 is constitutional. We affirm the trial court for the following reasons.
(1) Article II, section 19 has two requirements in its two clauses: An act must have only one subject, and the subject of the act must be contained in the act's title. The single subject rule of art. II, § 19 is intended to prevent legislators, whether the people or the Legislature, from having to vote for a law that they do not favor in order to obtain a law which they do. I-695 contains two subjects: (1) limiting license fees tabs to $30; and (2) requiring voter approval of all future state and local tax increases. These two subjects are contained in both the title and the body of I-695. I-695 is therefore unconstitutional in its entirety.
(2) The second clause of art. II, § 19 requires that the subject of a measure appear in the title. The purpose of this requirement is to notify those voting on the measure of its contents. I-695's voter approval provision, section 2, applies to taxes. I-695's express definition of this term establishes that tax does not mean tax as the term is commonly understood. Instead, tax as used in I-695 has a broader meaning, including fees and charges which are not traditionally considered to be taxes. The title therefore fails to provide notice that I-695's voter approval provision does not apply only to taxes as that term is commonly understood. Accordingly, section 2 of I-695 is unconstitutional under the second clause of art. II, § 19.
(3) Article II, section 1 concerns the legislative power in this state. Article II, section 1(a) and section 1(b) provide for the initiative and referendum powers, which are the people's legislative powers. The referendum power of the people has two forms. The people can petition for referendum of legislation that the Legislature has passed. To do so, four percent of the voters must sign a petition. Alternatively, the Legislature may refer a measure to the people. Section 2 of I-695 requires voter approval of all future tax legislation passed by the Legislature, but does not require a petition of the voters as to the specific piece of legislation, nor referral by the Legislature. Section 2 therefore establishes a referendum procedure not allowed under the state constitution and accordingly violates art. II, § 1(b).
(4) Article II, section 37 prohibits enactment of legislation that revises or amends other acts without setting them forth at full length. The purposes of this provision are to avoid confusion, ambiguity and uncertainty in the law that would occur if the law existed in separate and disconnected legislative provisions, and to disclose the new law's impact on existing laws. Section 2 of I-695 violates this constitutional provision because it amends a statute already providing for voter approval of a port district's industrial improvement assessment district without setting forth the existing act and showing how it is amended. Neither the existing statute nor the new enactment, I-695, discloses the full law respecting such voter approval.

FACTS
In November 1999, the voters of Washington passed I-695 by a 56.16 percent vote. *774 Laws of 2000, ch. 1 (effective Jan. 1, 2000). The ballot title of I-695 is Shall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed.[1] State of Washington Voters Pamphlet, General Election (Nov. 2, 1999). Section 1 of I-695 sets motor vehicle license tab fees at $30. Laws of 2000, ch. 1, § 1(1). Section 2 provides that [a]ny tax increase imposed by the state shall require voter approval. Id. § 2(1). Tax is defined and includes, but is not necessarily limited to, sales and use taxes, property taxes, business and occupation taxes, excise taxes, fuel taxes, impact fees, license fees, permit fees, and any monetary charge by government. Id. § 2(2). Tax does not include [h]igher education tuition and [c]ivil and criminal fines and other charges collected in cases of restitution or violation of law or contract. Id. § 2(3). A `tax increase' includes, but is not necessarily limited to, a new tax, a monetary increase in an existing tax, a tax rate increase, an expansion in the legal definition of a tax base, and an extension of an expiring tax. Id. § 2(4). State is defined as including, but is not necessarily limited to, the state itself and all its departments and agencies, any city, county, special district, and other political subdivision or governmental instrumentality of or within the state. Id. § 2(5). The voter approval provision does not apply to any specific emergency measure authorized by vote of two-thirds (2/3) of the members of each house of the legislature and expiring not later than twelve (12) months from the effective date of the emergency act. Id. § 2(6). The provisions of section 2 of I-695 are additional to and do not replace, the provisions of Initiative 601. Id. § 2(7).
Section 3 of I-695 repeals 44 statutes. Id. § 3. I-695 states these are statutes which impose taxes and fees on vehicles[,] id., but some of the repealed statutes allocate funds to specific programs such as public transportation. I-695 is to be liberally construed, id. § 4, and contains a severability provision, id. § 5.
Sections 1 and 3 of I-695 repealed the motor vehicle excise tax (MVET), which many perceived as an unfair tax. Initially the MVET was a tax on vehicles, in lieu of a property tax, of 1.5 percent of the fair market value of the vehicle. Laws of 1937, ch. 228. In 1999, the MVET was 2.2 percent, and the value of vehicles was not determined according to fair market value, but rather was tied to the manufacturer's base suggested retail price and the age of the vehicle. RCW 82.44.020; RCW 82.44.041(3)(b). MVET revenues were allocated to specific programs, such as public transportation, criminal justice, fire protection, and public health.
Prior to I-695, most vehicle owners also paid a $2 clean air excise tax. RCW 82.44.020(2) and RCW 82.44.110(2). Annual license fee statutes set license fees at under $30 for many vehicles. RCW 46.16.060(1). Most vehicle owners paid a $1 license plate fee, RCW 46.16.650, and a $.10 fee for highway studies, RCW 46.16.061. Owners of travel trailers and campers paid an excise tax of 1.1 percent. RCW 82.50.400; RCW 82.50.410. Owners of campers and travel trailers also paid a clean air tax of $2.25 under RCW 82.50.405. All of these statutes were repealed by I-695.
I-695 did not repeal county and certain municipality annual license fees of up to $15 for most motor vehicles registered in their jurisdiction. RCW 82.80.020(1). Municipalities may impose a special excise tax of up to.725 percent of the value of motor vehicles owned by municipal residents. RCW 35.58.273; RCW 82.44.150. The second of these statutes was repealed by I-695 among other things, it allocated revenues collected under RCW 35.58.273 but the other two were not. Certain cities and counties are authorized to impose an additional excise tax of up to .8 percent to provide for a high capacity transportation system. RCW 81.104.160(1). This statute was not repealed by I-695. Further, a $3 license filing fee, RCW 46.01.140(4)(a), and a $3 subagent fee, where *775 applicable, RCW 46.01.140(5), were not repealed.
Thus, while repealing many statutes imposing vehicle taxes and fees, the .725 percent local vehicle excise tax, the .8 percent local transit excise tax, the $3 filing fee, the $3 subagent fee, and the $15 local vehicle license fee were not repealed by I-695.
In the voters pamphlet for the November 1999 election, the proponents of the measure explained that section 2 of I-695, the voter approval provision, was included to prevent imposition of other taxes that would replace lost MVET revenues.
Shortly after the voters adopted I-695, the seven suits in this consolidated case were filed.[2] In Amalgamated Transit Union Local 587 v. State, individual union members and Amalgamated Transit Union Local 587 (Amalgamated Transit) alleged that I-695 violates the single-subject and subject-in-title requirements of art. II, § 19, that I-695, section 2 provides for an automatic referendum on all future tax and fee increases in violation of art. II, § 1(b)'s requirements that any referendum petition must have the signatures of four percent of the voters and that measures providing for the support of government and its public institutions are not subject to referendum, and that I-695 violates art. II, § 37, which requires the text of any acts amended or revised by a new enactment be set out in the new act. Amalgamated Transit sought a declaratory judgment that I-695 violates the state constitution in its entirety and a permanent injunction against enforcement of any of the provisions of I-695.
In Vashon-Maury Island Community Council v. State, Vashon Island Community Council (Vashon Island) alleged the same violations of art. II, § 1(b) (concerning referenda) and art. II, § 37 (setting forth amended or revised acts), but as to art. II, § 19, alleged only that I-695 violates the single-subject requirement. Vashon-Maury sought injunctive and declaratory relief.
In City of Bainbridge Island v. State, cities Bainbridge Island and Bremerton alleged that I-695, section 2, violated art. II, § 1(b)'s four percent voter signature requirement, art. II, § 19's single-subject and subject-in-title requirements, and art. II, § 37 (setting forth amended or revised acts). They also alleged that section 2 violates art. VII, § 1 and art. II, § 22 because it restricts the Legislature's constitutional power to enact laws by majority vote; that section 2 violates art. I, § 23 because it will impair contracts between the cities and their bondholders; and that section 2 violates art. XXIII because it attempts to amend the constitution. The cities of Bainbridge Island, Bremerton, and Lakewood (Cities) asserted that charges made by cities for goods and proprietary services are not subject to the voter approval requirements of section 2 of I-695 because they are not taxes within the meaning of I-695. This interpretive issue is the only part of the complaint which Lakewood joined in. The Cities sought declaratory and injunctive relief.
In Puget Sound Clean Air Agency v. State, plaintiff Puget Sound Clean Air Agency (Clean Air Agency) is responsible under state and federal law for air quality regulation and management in the region comprised of King, Pierce, Snohomish, and Kitsap Counties. The Clean Air Agency sought a declaratory judgment that section 2 of I-695 does not prohibit the agency from recovering full reimbursement for certain operating permit program costs; that I-695 violates the single-subject rule of art. II, § 19; that section 2 violates art. II, § 1 and art. II, § 22 (improper amendment of initiative and referendum procedures); that I-695 improperly repealed statutes in violation of art. II, § 37; *776 that I-695 violates art. XXIII (amendment of constitution); that I-695 improperly restricts municipal taxing authority in violation of art. XI, § 12; and also sought a declaration as to the application and effect of the voter approval requirement for any charges and fees subject to I-695.
In Tacoma Water v. State, Tacoma Water, a division of the Tacoma's Department of Public Utilities, Covington Water District, Lakehaven Utility District, Seattle Public Utilities (a Seattle city department, and individual E.E. (Ted) Coates, an individual voter paying rates and taxes, sought a declatory judgment that the voter approval requirements of section 2 of I-695 do not apply to water rates or other utility charges, including charges for goods, services, or benefits provided in exchange for monetary or other consideration, to local improvement assessments, to connection or capacity charges, or to inter-governmental and intra-governmental payments and charges. They also sought a declaratory judgment that I-695 violates art. II, §§ 1, 21, and 22 (referendum procedures and procedures for enactment of laws); art. II, § 19's requirements of a single subject and the subject in the title; art. II, § 37's requirement that amended or revised acts be set forth in full; art. VII, § 1's prohibition against surrendering, suspending or contracting away taxing power; art. VIII, § 7's prohibition against unlawful gifts of public funds (insofar as I-695 would limit charges to less than fair market value); art. XI, § 12 (local taxing authority); and art. XXIII (procedures for amending the constitution).
In Port of Whitman County v. State, the Ports of Whitman County, Tacoma, Skagit County, Seattle, Longview, Kennewick, Friday Harbor, and Bellingham (Port Districts) sought a declaratory judgment that I-695 does not apply to rates, tariffs, fees, rents, assessments, local improvement district and industrial development district assessments, and other charges imposed by port districts in carrying out their functions, including, but not limited to, the operation of harbor and marina improvements, rail and motor vehicle transfer facilities, water transfer and terminal facilities, airports and terminal facilities, industrial development facilities, trade centers, and related commercial facilities. They asserted that these charges do not fall within the meaning of the term tax in section 2 of I-695. These parties did not challenge the constitutionality of I-695.
In PUD No. 1 of Snohomish Cy. v. State, Public Utility District No. 1 of Snohomish County (Snohomish PUD) sought a declaratory judgment that section 2 of I-695 does not apply to the establishment and collection of rates and charges for electric energy and water, wastewater collection, treatment and disposal, and for other services, facilities, and commodities sold, furnished or supplied by public utility districts in a proprietary capacity; that section 2 does not apply to other monetary charges by public utility districts which are not commonly understood to be taxes; and that section 2 does not apply to the levy of special assessments by public utility districts. Snohomish PUD also sought a permanent injunction preventing enforcement of section 2 as to these items.
The Amalgamated Transit and Vashon-Maury cases were consolidated at trial, and all others were linked. The $30 License Tab Initiative Campaign (the Campaign) intervened all cases except Puget Sound Clean Air Agency v. State.
On March 6, 2000, King County Judge Alsdorf heard cross-motions for summary judgment, and issued a written decision March 14, 2000, granting summary judgment in favor of respondents. The court held that I-695 violates the state constitution because (1) section 2 unconstitutionally mandates universal referenda in violation of art. II, § 1(b)'s requirement that four percent of the registered voters sign a petition for referendum of an act of the Legislature; (2) section 2 unconstitutionally mandates universal referenda on laws and acts necessary for the support of state government and its existing institutions in violation of art. II, § 1(b);(3) Section 2 is unconstitutional because it seeks to amend the state constitution without compliance with art. XXIII; (4) the initiative as a whole is unconstitutional because it covers more than one subject in violation of art. II, § 19; (5) sections 2 and 3 violate art. II, § 19 because not all subjects in their text are *777 identified in the title; and (6) the initiative as a whole violates art. II, § 37 because it is not a complete act, and it fails to set forth the text of other laws which it amends and fails to explain how those amendments are worded or are to be implemented.
The court struck down the initiative in its entirety. The court also issued an injunction against the State and any of its subdivisions from taking any action to implement or enforce section 2, but declined to issue an injunction as to the remainder of I-695 because it would be disruptive to enjoin the operation or enforcement of sections 1 and 3.
The State and the Campaign appealed directly to this court, which granted review. The League of Women Voters of Washington, the Association of Washington Public Hospital Districts, the Association of Washington Housing Authorities, and individuals Conley Gene E. Kincheloe, Josie L. Schindler, and the Washington Coalition of Citizens with Disabilities (Coalition) were granted leave to file briefs as amici curiae.
After the trial court's decision, on March 31, 2000, the Legislature enacted Senate Bill 6865, Laws of 2000, 1st Spec. Sess., ch. 1, repealing the MVET and setting vehicle license tab fees at $30.

ANALYSIS
I. Campaign's Motion to Dismiss
The Campaign includes in its opening brief a motion to dismiss all the respondents and all the cases on various grounds. A party may include in a brief only a motion which, if granted, would preclude hearing the case on the merits. RAP 17.4(d). If the Campaign's motion is granted in whole or in part, it would preclude a hearing on the merits as to one or more of the respondents. Accordingly, we address the motion.
1. Mootness
The Campaign first contends that the Amalgamated Transit respondents and Vashon-Maury, and their cases, should be dismissed on the grounds of mootness. The Campaign says these respondents challenged section 1 of I-695, reducing vehicle tabs to $30, and all of their asserted injuries arose from the reduction of the MVET in sections 1 and 3 of I-695. The Campaign says these respondents have no standing or particularized interest apart from any other member of the public, citing Greater Harbor 2000 v. City of Seattle, 132 Wash.2d 267, 281-82, 937 P.2d 1082 (1997). As the Campaign points out, the Legislature recently enacted a $30 tab provision which became effective March 31, 2000. See Laws of 2000, 1st Sp. Sess., ch. 1 (S.B. 6865, retroactive to Jan. 1, 2000). The State, however, does not agree that the legislation renders the major issues moot.
Respondent Amalgamated Transit maintains that even a technically moot case may be reviewed where it presents issues of continuing and substantial public interest. Philadelphia II v. Gregoire, 128 Wash.2d 707, 712, 911 P.2d 389 (1996); Sorenson v. City of Bellingham, 80 Wash.2d 547, 558, 496 P.2d 512 (1972).[3] We are not convinced that claims based on section 1 of I-695, the $30 license tab fee section, come within this exception. Section 1 of I-695 involves a limited subject and there is no serious dispute that in general an initiative can repeal, impose, or amend a specific tax.
However, for purposes of the single subject and subject-in-title requirements of art. II, § 19, we must consider I-695 as a whole in order to determine its validity. Also, section 1 of I-695 is relevant to the art. II, § 37 claims. Therefore, for the art. II, § 19 claims and the art. II, § 37 claims, the Legislature's enactment does not moot the issues. Amalgamated Transit argued to the trial court that I-695 violates art. II, § 19 and art. II, § 37, and is entitled to argue these claims *778 before this court. Vashon-Maury joined in Amalgamated Transit's arguments.
Also, contrary to the Campaign's claim that Amalgamated Transit challenged only section 1 of I-695, Amalgamated Transit argued to the trial court that its members directly depend upon monetary charges levied by state and local governments for their jobs and salaries and under section 2 of I-695 these levies are subject to an unconstitutional vote. The Legislature's new enactment does not affect section 2 of I-695. As noted, Vashon-Maury joined in Amalgamated Transit's arguments. Vashon-Maury says it is a representative organization whose members' livelihoods and property values depend upon ferry and bus services as well as police protection provided through monetary charges levied by state and local government, which are subject to unconstitutional vote under section 2.
In its reply brief, the Campaign also says that the Legislature's recently enacted supplemental budget accommodated the people's initiative decision by restoring some of the funding which repeal of the MVET removed from various programs such as public transportation, police and fire protection, and provided for raising the local sales tax for public transportation with voter approval. The Campaign does not say that this legislation renders the rest of the issues in these cases moot, and clearly it does not. The Legislature's action providing some relief to local government cannot validate an unconstitutional measure. Moreover, section 2 of I-695 remains, and will continue to bar any new taxes or tax increases without voter approval thus the initiative has continuing impact aside from repeal of the MVET and the Legislature's restoration of some funding.
These cases are not moot as a result of the Legislature's enactment of legislation repealing the MVET and imposition of a $30 license fee.
2. Failure to Cross-Appeal
The Campaign also moves to dismiss the Cities, the Tacoma Water respondents, the Snohomish PUD, and the Port Districts on the ground that the trial court entered a declaratory judgment adverse to their interests and none have appealed. The Campaign reasons these respondents had argued for a narrow reading of tax in I-695, but the trial court construed the term broadly. These respondents' failure to cross-appeal, the Campaign says, precludes consideration of their claims.
Failure to cross-appeal an issue generally precludes its review on appeal. See, e.g., Tellevik v. Real Prop. Known As 31641 W. Rutherford St., 120 Wash.2d 68, 89, 838 P.2d 111, clarified on denial of reconsideration, 845 P.2d 1325 (1992). However, [a] successful litigant need not cross-appeal in order to urge any additional reasons in support of the judgment, even though rejected by the trial court, but no additional relief will be granted on appeal in the absence of a cross-appeal. Peterson v. Hagan, 56 Wash.2d 48, 52, 351 P.2d 127 (1960); see City of Tacoma v. Taxpayers of Tacoma, 108 Wash.2d 679, 685, 743 P.2d 793 (1987). These respondents prevailed in the trial court, not as a result of a narrow construction of the term tax, but because of the trial court's determination that I-695 is unconstitutional in its entirety. Having obtained a favorable judgment, the fact that these respondents did not cross-appeal the trial court's ruling on the meaning of the term tax in I-695 is not a basis to dismiss them, nor does it bar them from challenging the trial court's construction of the term as an alternative ground to affirm the judgment in their favor.
3. Standing and Justiciability
The Campaign also claims that all respondents lack standing and the cases are nonjusticiable, citing Walker v. Munro, 124 Wash.2d 402, 879 P.2d 920 (1994). When moving for summary judgment in the trial court, the Campaign did not raise any issue regarding the standing of the respondents to challenge the constitutionality of I-695 under art. II, §§ 1(b), 19, and 37. The Campaign attempts to raise the standing issue for the first time on appeal. In the past, this court has held that the issues of standing and justiciability under the Uniform Declaratory Judgments Act, chapter 7.24 RCW, may be *779 raised for the first time on appeal. Washington Beauty College, Inc. v. Huse, 195 Wash. 160, 80 P.2d 403 (1938). However, the Campaign has not provided sufficient argument regarding standing. Its cite to Walker is virtually the whole of its argument. We will not consider the issue in the absence of adequate argument. See, e.g., State v. Wheaton, 121 Wash.2d 347, 850 P.2d 507 (1993); Kadoranian v. Bellingham Police Dep't, 119 Wash.2d 178, 186-87, 829 P.2d 1061 (1992).
The same problem exists with regard to the claim that these actions are nonjusticiable. The Campaign attempts to raise this issue for the first time on appeal, but fails to provide more than conclusory statements and a single cite to Walker. We also note that under the Declaratory Judgments Act, the requirement of standing tends to overlap justiciability requirements. 15 Lewis H. Orland & Karl B. Tegland, Washington Practice: Trial Practice, Civil § 602, at 394 (5th ed.1996). Thus the inadequacy of briefing respecting standing carries over to the nonjusticiability challenges. We decline to address the Campaign's claim that none of the actions are justiciable.[4]
II. Constitutionality of I-695
An exercise of the initiative power is an exercise of the reserved power of the people to legislate. State ex rel. Heavey v. Murphy, 138 Wash.2d 800, 808, 982 P.2d 611 (1999); Belas v. Kiga, 135 Wash.2d 913, 920, 959 P.2d 1037 (1998). In approving an initiative measure, the people exercise the same power of sovereignty as the Legislature does when enacting a statute. Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 556, 901 P.2d 1028 (1995). The fact that the legislative body has the power to achieve a particular result does not necessarily render its action constitutional; it must follow constitutional procedures. State ex rel. Living *780 Servs., Inc. v. Thompson, 95 Wash.2d 753, 755, 630 P.2d 925 (1981). The people acting in their legislative capacity are subject to constitutional mandates. State ex rel. Heavey, 138 Wash.2d at 808, 982 P.2d 611; Gerberding v. Munro, 134 Wash.2d 188, 196, 949 P.2d 1366 (1998); Culliton v. Chase, 174 Wash. 363, 373-74, 25 P.2d 81 (1933). The initiative process cannot be used to amend the constitution. Gerberding, 134 Wash.2d at 210 n. 11, 949 P.2d 1366.
A statute enacted through the initiative process is, as are other statutes, presumed to be constitutional. Brower v. State, 137 Wash.2d 44, 52, 969 P.2d 42 (1998); Gerberding, 134 Wash.2d at 196, 949 P.2d 1366; State ex rel. O'Connell v. Meyers, 51 Wash.2d 454, 458, 319 P.2d 828 (1957). A party challenging the statute's constitutionality bears the heavy burden of establishing its unconstitutionality beyond a reasonable doubt. State ex rel. Heavey, 138 Wash.2d at 808, 982 P.2d 611; Gerberding, 134 Wash.2d at 196, 949 P.2d 1366. This standard is met if argument and research show that there is no reasonable doubt that the statute violates the constitution. Belas, 135 Wash.2d at 920, 959 P.2d 1037; Island County v. State, 135 Wash.2d 141, 147, 955 P.2d 377 (1998).
Rules of statutory construction apply to initiatives. Seeber v. Wash. State Pub. Disclosure Comm'n, 96 Wash.2d 135, 139, 634 P.2d 303 (1981); Gibson v. Dep't of Licensing, 54 Wash.App. 188, 192, 773 P.2d 110 (1989). Thus, in determining the meaning of a statute enacted through the initiative process, the court's purpose is to ascertain the collective intent of the voters who, acting in their legislative capacity, enacted the measure. Wash. State Dep't of Revenue v. Hoppe, 82 Wash.2d 549, 552, 512 P.2d 1094 (1973). Where the voters' intent is clearly expressed in the statute, the court is not required to look further. Senate Republican Campaign Comm. v. Pub. Disclosure Comm'n, 133 Wash.2d 229, 242, 943 P.2d 1358 (1997); City of Tacoma v. State, 117 Wash.2d 348, 356, 816 P.2d 7 (1991); see Biggs v. Vail, 119 Wash.2d 129, 134, 830 P.2d 350 (1992) (if statutory meaning is clear from plain and unambiguous language, that meaning must be accepted by the court). In determining intent from the language of the statute, the court focuses on the language as the average informed voter voting on the initiative would read it. State v. Brown, 139 Wash.2d 20, 28, 983 P.2d 608 (1999); Senate Republican Campaign Comm., 133 Wash.2d at 243, 943 P.2d 1358. Where the language of an initiative enactment is plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation. State v. Thorne, 129 Wash.2d 736, 762-63, 921 P.2d 514 (1996). However, if there is ambiguity in the enactment, the court may examine the statements in the voters pamphlet in order to determine the voters' intent. Thorne, 129 Wash.2d at 763, 921 P.2d 514; see Lynch v. Dep't of Labor & Indus., 19 Wash.2d 802, 812-13, 145 P.2d 265 (1944); see Biggs, 119 Wash.2d at 134, 830 P.2d 350 (if there is ambiguity, extrinsic aids, such as legislative history, may be used to determine legislative intent).
[I]t is not the prerogative nor the function of the judiciary to substitute what they may deem to be their better judgment for that of the electorate in enacting initiatives... unless the errors in judgment clearly contravene state or federal constitutional provisions. Fritz v. Gorton, 83 Wash.2d 275, 287, 517 P.2d 911 (1974). Nor is it the province of the courts to declare laws passed in violation of the constitution valid based upon considerations of public policy. State ex rel. Wash. Toll Bridge Auth. v. Yelle, 32 Wash.2d 13, 24-25, 200 P.2d 467 (1948).
A grant of summary judgment is reviewed de novo, and the reviewing court engages in the same inquiry as the trial court. Trimble v. Wash. State Univ., 140 Wash.2d 88, 92, 993 P.2d 259 (2000). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Construction of a statute is a question of law which is reviewed de novo. State v. Ammons, 136 Wash.2d 453, 456, 963 P.2d 812 (1998).
1. Article II, section 19
Article II, section 19 of the Washington State Constitution provides that *781 [n]o bill shall embrace more than one subject, and that shall be expressed in the title. Art. II, § 19 is to be liberally construed in favor of the legislation. Wash. Fed'n, 127 Wash.2d at 555, 901 P.2d 1028; State Fin. Comm. v. O'Brien, 105 Wash.2d 78, 80, 711 P.2d 993 (1986); Wash. State Sch. Dirs. Ass'n v. Dep't of Labor & Indus., 82 Wash.2d 367, 371, 510 P.2d 818 (1973). Art. II, § 19 applies to initiatives. Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 551-53, 901 P.2d 1028 (1995); Fritz v. Gorton, 83 Wash.2d 275, 328-42, 315-16, 316, 517 P.2d 911 (1974) (holding of court by six justices in dissenting and concurring opinions).
There are two distinct prohibitions in art. II, § 19. See Patrice v. Murphy, 136 Wash.2d 845, 852, 966 P.2d 1271 (1998). The first is that no bill shall embrace more than one subject. The purpose of this prohibition is to prevent logrolling or pushing legislation through by attaching it to other legislation. Power, Inc. v. Huntley, 39 Wash.2d 191, 198, 235 P.2d 173 (1951); see also State v. Broadaway, 133 Wash.2d 118, 124, 942 P.2d 363 (1997); State v. Thorne, 129 Wash.2d 736, 757, 921 P.2d 514 (1996); Flanders v. Morris, 88 Wash.2d 183, 187, 558 P.2d 769 (1977). The second prohibition is that no bill shall have a subject which is not expressed in its title. The purpose of this prohibition is to notify members of the Legislature and the public of the subject matter of the measure. Power, 39 Wash.2d at 198, 235 P.2d 173; see also Broadaway, 133 Wash.2d at 124, 942 P.2d 363; Thorne, 129 Wash.2d at 757, 921 P.2d 514; Flanders, 88 Wash.2d at 187, 558 P.2d 769.
a. The single-subject rule.
In determining whether I-695 contains more than one subject in violation of art. II, § 19, we begin with the title of the measure. The Legislature may, if it chooses, adopt a very broad and comprehensive title in a bill, in which case great liberality will be indulged to hold that any subject reasonably germane to such title may be embraced within the body of the bill. DeCano v. State, 7 Wash.2d 613, 627, 110 P.2d 627 (1941); accord Wash. Fed'n, 127 Wash.2d at 555-56, 901 P.2d 1028; Wash. Toll Bridge Auth. v. State, 49 Wash.2d 520, 523, 304 P.2d 676 (1956); State ex rel. Schofield v. Easterday, 182 Wash. 209, 212, 46 P.2d 1052 (1935); Percival v. Cowychee & Wide Hollow Irr. Dist., 15 Wash. 480, 482, 46 P. 1035 (1896). There is no violation of art. II, § 19 even if a general subject contains several incidental subjects or subdivisions. Wash. Fed'n, 127 Wash.2d at 556, 901 P.2d 1028; State v. Grisby, 97 Wash.2d 493, 498, 647 P.2d 6 (1982).
A general title is one which is broad rather than narrow. Wash. Fed'n, 127 Wash.2d at 555, 901 P.2d 1028; O'Brien, 105 Wash.2d at 90, 711 P.2d 993; Gruen v. State Tax Comm'n, 35 Wash.2d 1, 22, 211 P.2d 651 (1949). It may be comprehensive and generic rather than specific. Olympic Motors, Inc. v. McCroskey, 15 Wash.2d 665, 672, 132 P.2d 355 (1942); DeCano, 7 Wash.2d at 627, 110 P.2d 627. Examples of general titles are: An Act relating to violence prevention. In re Boot, 130 Wash.2d 553, 566, 925 P.2d 964, 971 (1996). An Act Relating to the amendment or repeal of statutes superseded by court rule. State v. Howard, 106 Wash.2d 39, 45, 722 P.2d 783 (1985). Shall campaign contributions be limited; public funding of state and local campaigns be prohibited; and campaign related activities be restricted? Wash. Fed'n, 127 Wash.2d at 555, 557, 901 P.2d 1028. [A]n act relating to capital projects.... O'Brien, 105 Wash.2d at 79-80, 711 P.2d 993. An Act relating to tort actions.... Scott v. Cascade Structures, 100 Wash.2d 537, 546, 673 P.2d 179 (1983). An Act Relating to Community Colleges.... Wash. Educ. Ass'n v. State, 97 Wash.2d 899, 906-07, 652 P.2d 1347 (1982). An Act Relating to the death penalty.... State v. Grisby, 97 Wash.2d 493, 498, 647 P.2d 6 (1982). An Act Relating to industrial insurance.... Wash. State Sch. Dirs. Ass'n v. Dep't of Labor & Indus., 82 Wash.2d 367, 371, 510 P.2d 818 (1973). An Act to provide an Insurance Code for the State of Washington; to regulate insurance companies and the insurance business; to provide for an Insurance Commissioner; to establish the office of State Fire Marshall; to provide penalties for the violation of the provisions of this act.... Kueckelhan v. Fed. Old Line Ins. Co., 69 *782 Wash.2d 392, 402, 418 P.2d 443 (1966). An Act Relating to revenue and taxation; increasing the motor vehicle fuel tax, the use fuel tax and motor license fees, gross weight fees, fees in lieu of gross weight fees, seating capacity fees, providing for the distribution of said revenue; establishing an urban aid account in the motor vehicle fund; establishing a Puget Sound reserve account; providing for the use of the urban aid account ...; authorizing investment of the Puget Sound reserve account.... State ex rel. Wash. Toll Bridge Auth. v. Yelle, 61 Wash.2d 28, 31-33, 377 P.2d 466 (1962). An Act authorizing the incorporation of mutual savings banks, defining their powers and duties, and prescribing penalties for violations hereof. In re Peterson's Estate, 182 Wash. 29, 33, 45 P.2d 45 (1935).
In assessing whether a title is general, it is not necessary that the title contain a general statement of the subject of an act; [a] few well-chosen words, suggestive of the general subject stated, is all that is necessary. State ex rel. Schofield, 182 Wash. at 212, 46 P.2d 1052; accord Wash. Fed'n, 127 Wash.2d at 554, 901 P.2d 1028; In re Peterson's Estate, 182 Wash. at 33, 45 P.2d 45.
Where a general title is used, all that is required is rational unity between the general subject and the incidental subjects. Wash. Fed'n, 127 Wash.2d at 556, 901 P.2d 1028; Grisby, 97 Wash.2d at 498, 647 P.2d 6; Scott, 100 Wash.2d at 545, 673 P.2d 179; Kueckelhan, 69 Wash.2d at 403, 418 P.2d 443; Gruen v. State Tax Comm'n, 35 Wash.2d 1, 22, 211 P.2d 651 (1949), overruled on other grounds by State ex rel. Washington State Fin. Comm. v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963). This principle has been explained as follows:
Under the true rule of construction, the scope of the general title should be held to embrace any provision of the act, directly or indirectly related to the subject expressed in the title and having a natural connection thereto, and not foreign thereto. Or, the rule may be stated as follows: Where the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably connected with it, and all measures which will, or may, facilitate the accomplishment of the purpose so stated, are properly included in the act and are germane to its title.
Kueckelhan, 69 Wash.2d at 403, 418 P.2d 443 (quoting Gruen, 35 Wash.2d at 22, 211 P.2d 651). The requirement of rational unity has also been explained as follows:
[A constitutional single-subject prohibition] does not by restricting the contents of an `act' to one subject, contemplate a metaphysical singleness of idea or thing, but rather that there must be some rational unity between the matters embraced in the act, the unity being found in the general purpose of the act and the practical problems of efficient administration. It is hardly necessary to suggest that matters which ordinarily would not be thought to have any common features or characteristics might, for purposes of legislative treatment, be grouped together and treated as one subject. For purposes of legislation, `subjects' are not absolute existences to be discovered by some sort of a priori reasoning, but are the result of classification for convenience of treatment and for greater effectiveness in attaining the general purpose of the particular legislative act....
State ex rel Washington Toll Bridge Auth. v. Yelle, 61 Wash.2d at 33, 377 P.2d 466 (quoting State ex rel. Test v. Steinwedel, 203 Ind. 457, 467, 180 N.E. 865 (1932) (discussing Indiana constitutional provision)).
A restrictive title, in contrast to a general title, `is one where a particular part or branch of a subject is carved out and selected as the subject of the legislation.' Broadaway, 133 Wash.2d at 127, 942 P.2d 363 (quoting Gruen, 35 Wash.2d at 23, 211 P.2d 651). A restrictive title will not be regarded as liberally as a general title, and provisions not fairly within it will not be given force. Broadaway, 133 Wash.2d at 127, 942 P.2d 363; see Thorne, 129 Wash.2d at 758, 921 P.2d 514; State ex rel. Wash. Toll Bridge Auth. v. Yelle, 32 Wash.2d 13, 26, 200 P.2d 467 (1948).
A restrictive title is narrow, as opposed to broad. See [Gruen ] at 22, 211 P.2d 651; Washington Fed'n, 127 Wash.2d at 555, *783 901 P.2d 1028; State Fin. Comm. v. O'Brien, 105 Wash.2d 78, 80, 711 P.2d 993 (1986). It is of specific rather than generic import. Olympic Motors, Inc. v. McCroskey, 15 Wash.2d 665, 672, 132 P.2d 355, 150 A.L.R. 1306 (1942); DeCano v. State, 7 Wash.2d 613, 627, 110 P.2d 627 (1941). A restrictive title expressly limits the scope of the act to that expressed in the title. See ... Daviscourt v. Peistrup, 40 Wash. App. 433, 439-440, 698 P.2d 1093 (1985).
Broadaway, 133 Wash.2d at 127, 942 P.2d 363. Examples of restrictive titles are:
Shall criminals who are convicted of `most serious offenses' on three occasions be sentenced to life in prison without parole? State v. Thorne, 129 Wash.2d 736, 757, 921 P.2d 514 (1996). An act relating to the acquisition of property by public agencies.... Daviscourt v. Peistrup, 40 Wash. App. 433, 437, 698 P.2d 1093 (1985).... An act relating to local improvements in cities and towns.... Cory v. Nethery, 19 Wash.2d 326, 329-31, 142 P.2d 488 (1943). An act relating to the rights and disabilities of aliens with respect to land.... DeCano v. State, 7 Wash.2d 613, 623, 110 P.2d 627 (1941). An act relating to the venue of civil actions in justice courts. National Ass'n of Creditors v. Brown, 147 Wash. 1, 7, 264 P. 1005 (1928). An act creating and providing for the enforcement of liens for labor and material. Armour & Co. v. Western Constr. Co., 36 Wash. 529, 537, 78 P. 1106 (1905). An act giving workmen's compensation benefits to persons engaged in hazardous and extrahazardous occupations in charitable institutions. Swedish Hosp. v. Department of Labor & Indus., 26 Wash.2d 819, 830-31, 176 P.2d 429 (1947).
Broadaway, 133 Wash.2d at 127-28 n. 2, 942 P.2d 363. In Broadaway, the title of Initiative 159 was held restrictive: An act relating to increasing penalties for armed crime.... Broadaway, 133 Wash.2d at 126-27, 942 P.2d 363. In Thorne, the title of Initiative 593 was also held restrictive: Shall criminals who are convicted of `most serious offenses' on three occasions be sentenced to life in prison without parole? Thorne, 129 Wash.2d at 757-58, 921 P.2d 514.
Cases where violations of the single-subject requirement have been found have varied. For example, an act providing criminal penalties for dognapping and the recovery of attorney fees in some civil replevin actions violated art. II, § 19. Barde v. State, 90 Wash.2d 470, 584 P.2d 390 (1978). An act which included a civil rights provision and regulation of cemeteries violated art. II, § 19. Price v. Evergreen Cemetery Co., 57 Wash.2d 352, 357 P.2d 702 (1960). In general, violations of the single-subject rule are more readily found where a restrictive title is used. E.g., Potter v. Whatcom County, 138 Wash. 571, 576, 245 P. 11 (1926) (restrictive title An Act Relating to townships and amending ... held not broad enough to embrace provision placing bridges costing more than $300 under the sole jurisdiction and control of the county); Brown, 147 Wash. at 7, 264 P. 1005 (restrictive title An Act Relating to the venue of civil actions in justice courts not broad enough to encompass provision that if an action was prosecuted contrary to the venue requirements, no jurisdiction over the defendant was obtained).
Where an initiative to the people is concerned, as is the case here, the relevant title for the art. II, § 19 inquiry is the ballot title, because not all initiatives have legislative titles; because it is the ballot title with which the voters are faced in the voting booth; and because it is the ballot title which can be appealed before an election and which thereafter appears on petitions and the ballot. Wash. Fed'n, 127 Wash.2d at 555, 901 P.2d 1028; see Thorne, 129 Wash.2d at 757, 921 P.2d 514; RCW 29.79.070.
The ballot title of I-695 is Shall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed?
The State and the Campaign contend that I-695 has a general title, and the single subject of the measure is limiting taxation. They urge that all of the provisions of I-695 are rationally related to the general subject of limiting taxation. However, in making this argument, they want the court to consider the voters pamphlet and legislative *784 history as evidence of rational unity.[5] In deciding whether a measure contains a single subject, however, the constitutional inquiry is founded on the question whether a measure is drafted in such a way that those voting on it may be required to vote for something of which the voter disapproves in order to obtain approval of an unrelated law. Wash. Fed'n, 127 Wash.2d at 552, 901 P.2d 1028; Wash. Toll Bridge Auth. v. State, 49 Wash.2d 520, 525, 304 P.2d 676 (1956). Thus, regardless of what is in the voters pamphlet or the history of the initiative, the rational relationship inquiry centers on what is in the measure itself, i.e., whether the measure contains unrelated laws.
Amalgamated Transit[6] argues that I-695 does not concern one subject, limiting taxes. Amalgamated Transit contends that from the plain language of the initiative the voters knew that as a whole the measure concerned more than just taxes. This is because the title and text expressly distinguish between taxes and fees. Amalgamated Transit argues that the difference between the two is of constitutional dimension, with a tax being a levy made for the purpose of raising revenue for a general governmental purpose and a fee being enacted principally as an integral part of the regulation of an activity and to cover the cost of regulation. Franks & Son, Inc. v. State, 136 Wash.2d 737, 750, 966 P.2d 1232 (1998). Amalgamated Transit urges that voters are aware of this fundamental legal distinction. Because I-695 concerns both fees and taxes, it does not contain a single subject, limiting taxation. Further, this respondent notes, I-695 had the effect of increasing some annual vehicle renewal fees, and this raising of government revenue is not within the subject of limiting taxes.
Amalgamated Transit further argues that the ballot title of I-695 contains three propositions, all of them restrictive. Amalgamated Transit urges that the ballot title carves out part of the subject of taxes, asking whether voter approval should be required; asks whether the license tab fee should be only $30; and carves out another facet of the general subject of taxes, i.e., whether to repeal existing vehicle taxes. Amalgamated Transit says that three restrictive title parts do not equal one general title.
The Tacoma Water respondents maintain that I-695 has at least two subjects: reducing license tab fees and voter approval of taxes. They urge that because these two subjects were tied together, the voters were not free to vote for one of the proposals and against the other if they wished. As do the appellants, these respondents also focus on history of the measure, and how the election campaign was conducted, to argue that limiting taxes is not the subject of I-695. They say that the stated purpose of the measure was to prevent replacement of MVET revenues by imposition of other taxes, and that given this purpose, there is no rational unity because the measure requires all new taxes and tax increases to be voted upon, not just those that might replace the MVET revenues. However, whether or not there is one subject in I-695 must be determined from the measure itself. I-695 does not, anywhere within its text or title, say that only taxes which could replace the MVET revenues are subject to voter approval. The measure on its face is broader than the Tacoma Water respondents urge is its subject.
The Tacoma Water respondents argue that there is no relationship at all between the subjects in I-695 in regard to Tacoma Water's water rates and charges. Amicus Curiae Public Hospital Districts similarly argues that there is no rational unity between repeal of the MVET and the voter approval provision *785 if applied to all government fees and charges, including its own charges because, it points out, it never received MVET revenue.
The Clean Air Agency offers another argument. It says that I-695's voter approval provision does not apply just to traditional taxes, but also applies to all fees or monetary charges by government. Therefore, because more than taxes are subject to voter approval, the subject matter of the initiative is not limiting taxation, contrary to the State's argument. (As the Clean Air Agency acknowledges, though, the State argues for a traditional definition of tax.)[7] This respondent also maintains that there are two subjects in I-695: repeal of the MVET and government process, in particular the way in which revenue generating laws can be made in the future.
Amicus Curiae League of Women Voters of Washington urges that I-695's title is not a general title because all it does is mirror the specific provisions of the initiative rather than identifying general topics on a theme in which the provisions fall. Amicus League of Women Voters cites State ex rel. Wash. Toll Bridge Auth. v. Yelle, 32 Wash.2d 13, 200 P.2d 467 (1948), a case where the court determined the title was restrictive, not general. As Amicus League of Women Voters points out, there the title of the original act related to toll bridges and tunnels, and the title to an amending act referred to toll bridges and the powers and duties of the toll bridge authority, and also referred to ferry connections. The court concluded that the title of the amendatory act was not a general title concerning a transportation system, but was instead a restrictive title referring to the specific subject of toll bridges and, at most, highway and ferry connections and approaches thereto. State ex rel. Wash. Toll Bridge Auth. v. Yelle, 32 Wash.2d at 27, 200 P.2d 467. The court reasoned that the body of the act contained more than one subject, toll bridges and ferries, and that its dual subjects did not comprehend[] any such broad appellation as `transportation system.' Id.
Amicus League of Women Voters says that, similarly, here the phrase limiting taxation is not found anywhere in the title or body of I-695, and urges that the voter approval provision does not limit taxes, but instead specifies a method of approving tax increases. These are not the same, the League urges, because specifying a method for approval is a broad procedural provision which directs how future tax increases will occur, not whether they will occur.[8]
However, as appellants argue, it is not necessary for the words limiting taxation to appear in the title or body of the act in order for I-695's title to be general. In Fritz v. Gorton, 83 Wash.2d 275, 290-91, 517 P.2d 911 (1974), the court identified the generic subject of I 276 as openness in government, though those words never appeared in the title. Cf. Thorne, 129 Wash.2d at 736, 758, 921 P.2d 514 (though the title was held to be restrictive, the subject matter was found to be persistent offenders even where those words did not appear in the title); but see State ex rel. Wash. Toll Bridge Auth. v. Yelle, 32 Wash.2d at 27, 200 P.2d 467 (noting that act did not mention transportation system). The League distinguishes Fritz on the basis that there the lengthy, detailed title would disclose the topic openness in government, while here, it contends, the average voter would not understand limiting taxation to be the subject of I-695.
We conclude that this single-subject issue is controlled by Wash. Toll Bridge Auth. v. State, 49 Wash.2d 520, 304 P.2d 676 (1956), relied upon by the Cities, Amalgamated Transit, and Amicus League of Women Voters. In that case, a new act was passed which provided procedures for establishing and financing toll roads, and also provided specifically for a toll road from Tacoma to Everett. The title included both of these *786 purposes. The court held this was a general title and adequately expressed the subjects in the act. Id. at 523, 304 P.2d 676. However, the court held that the two were not germane to each other because one purpose of the act was to provide for a specific road which was subject to accomplishment and not continuing in nature, while the second purpose did not pertain to any specific road but was continuing in effect. The act was unconstitutional because it contained two subjects in both the title and the body. Wash. Toll Bridge Auth., 49 Wash.2d at 524, 304 P.2d 676. A similar analysis was applied in Power. There, the court noted that art. II, § 19 prohibits the passage of an act relating to different subjects expressed in its title, in which case the whole act is void. Power, 39 Wash.2d at 200, 235 P.2d 173. The title and the act both contained two unrelated subjects, appropriations and a corporate income tax, and it was accordingly held unconstitutional in its entirety.[9]
Here, while the title of I-695 seems in part restrictive, i.e., the part which says that [s]hall ... license tab fees be $30 per year for motor vehicles[,] the balance of the title broadens its scope, similar to the title in Wash. Toll Bridge Auth. v. State. We conclude that I-695 has a general title. However, there is no rational unity between the subjects of I-695. Similar to the act in Wash. Toll Bridge Auth. v. State, I-695 also has two purposes: to specifically set license tab fees at $30 and to provide a continuing method of approving all future tax increases. Further, neither subject is necessary to implement the other. I-695 violates the single-subject requirement of art. II, § 19 because both its title and the body of the act include two subjects: repeal of the MVET and a voter approval requirement for taxes.
b. The subject-in-title rule of art. II, § 19.
The second requirement of art. II, § 19 is that the subject of an act must be expressed in its title. The purpose of this requirement is, as noted, provision of notice to legislators and the public of the contents of the measure. This court has recognized the particular importance of this requirement in the context of an initiative, noting that often voters will not reach the text of a measure or the explanatory statement, but may instead cast their votes based upon the ballot title. Wash. Fed'n, 127 Wash.2d at 553-54, 901 P.2d 1028.
The title of an act complies with art. II, § 19 if it gives notice which would lead to an inquiry into the body of the act or indicates the scope and purpose of the law to an inquiring mind. Wash. Fed'n, 127 Wash.2d at 555, 901 P.2d 1028; YMCA v. State, 62 Wash.2d 504, 506, 383 P.2d 497 (1963); Treffry v. Taylor, 67 Wash.2d 487, 491, 408 P.2d 269 (1965). However, the title need not be an index to the contents, nor must it provide details of the measure. Wash. Fed'n, 127 Wash.2d at 555, 901 P.2d 1028; Treffry, 67 Wash.2d at 491, 408 P.2d 269; Gruen, 35 Wash.2d at 22, 211 P.2d 651; Cory v. Nethery, 19 Wash.2d 326, 330, 142 P.2d 488 (1943); Petroleum Lease Props., Inc. v. Huse, 195 Wash. 254, 260, 80 P.2d 774 (1938); State ex rel. Zent v. Nichols, 50 Wash. 508, 97 P. 728 (1908); State ex rel. Cole v. City of New Whatcom, 3 Wash. 7, 27 P. 1020 (1891).
The trial court held that the word tax in the ballot title of I-695 does not provide the notice which art. II, § 19 requires because it fails to inform of the scope of the measure. The trial court held that tax does not have its traditional meaning in the context of I-695, and reasoned that because tax encompasses a broader range of fees and charges than are commonly referred to as taxes, use of the term tax in the title of I-695 provides insufficient notice of what the contents of the measure might include. Therefore I-695 is unconstitutional because it violates art. II, § 19.
In order to evaluate this issue, the parties' considerable arguments on the meaning of the term tax must be addressed. In brief, the trial court held that the term tax in I-695 must be given a broad construction to include *787 specific fees for commercial or proprietary products or services rendered or benefits received, fees, assessments other than taxes, and even utility charges by PUD's, rather than a narrower construction including traditional taxes. The State argues that the term tax should be construed to mean any compulsory charge for the support of government and to exclude amounts charged for specific goods or services, proprietary or commercial charges, and special assessments, such as local improvement districts (LID) assessments. The Snohomish PUD generally agrees with the State's approach. The Campaign does not discuss the issue in its briefing to this court. Amalgamated Transit also does not address the issue, and accordingly neither does Vashon-Maury Community Council (since it adopts Amalgamated Transit's argument on the issues). The Cities accept and argue on appeal the trial court's construction, but only for purposes of arguing to uphold the trial court's ruling that I-695 violates art. II, § 19. The Tacoma Water respondents argue that tax means a charge imposed on people, property, or transactions for the general funding of government without any required connection between the amount charged and the benefit received.
The meaning of the term tax is to be determined according to the intent of the voters. Wash. State Dep't of Revenue, 82 Wash.2d at 552, 512 P.2d 1094. If this intent can be determined from the language of the initiative, the court's inquiry ends there. Senate Republican Campaign Comm., 133 Wash.2d at 242, 943 P.2d 1358. Section 2(1) of I-695 provides that [a]ny tax increase imposed by the state shall require voter approval. Section 2(2), (3) and (4) provide:
(2) For the purposes of this section, tax includes, but is not necessarily limited to, sales and use taxes, property taxes, business and occupation taxes, excise taxes, fuel taxes, impact fees, license fees, permit fees, and any monetary charge by government.
(3) For the purposes of this section, tax does not include:
(a) Higher education tuition, and
(b) Civil and criminal fines and other charges collected in cases of restitution or violation of law or contract.
(4) For the purposes of this section, tax increase includes, but is not necessarily limited to, a new tax, a monetary increase of an existing tax, a tax rate increase, an expansion in the legal definition of a tax base, and an extension of an expiring tax.
Section 2(5) provides that state includes, but is not necessarily limited to, the state itself and all its departments and agencies, any city, county, special district, and other political subdivision or governmental instrumentality of or within the state.
Language in an initiative should be construed as the average informed voter voting on the initiative would read it. Brown, 139 Wash.2d at 28, 983 P.2d 608. As a noun, the term tax has as its common meaning a pecuniary charge imposed by legislative or other public authority upon persons or property for public purposes: a forced contribution of wealth to meet the public needs of a government. Webster's Third New International Dictionary 2345 (1986). These definitions probably accord with the average informed voter's understanding of the term tax, and are consistent with the State's argument that tax means a compulsory charge for the support of government. This definition is also consistent with legal definitions offered by the Port Districts and Snohomish PUD. Tax means an enforced contribution of money, assessed or charged by authority of sovereign government for the benefit of the state or the legal taxing authorities [and it] is not a debt or contract in the ordinary sense but, it is an exaction in the strictest sense of the word. State ex rel. City of Seattle v. Dep't of Pub. Util. of Wash., 33 Wash.2d 896, 902, 207 P.2d 712 (1949). Tax is a pecuniary burden laid upon individuals or property to support the government, and is a payment exacted by legislative authority. Essential characteristics of a tax are that it is not a voluntary payment or donation, but an enforced contribution, exacted pursuant to legislative authority. (Citation omitted.) Black's Law Dictionary 1457 (6th ed.1990).
*788 However, the language of I-695 indicates that tax does not have its traditional meaning. I-695 specifically defines the term tax. It would be unnecessary to define the term if it had its common meaning, and, if the term has its common meaning, the definition is superfluous. All language in a piece of legislation should be given effect, so that no provision is rendered superfluous. See City of Bellevue v. Lorang, 140 Wash.2d 19, 25, 992 P.2d 496 (2000); Western Petroleum Importers, Inc. v. Friedt, 127 Wash.2d 420, 428, 899 P.2d 792 (1995). Additionally, an enactment's definition of a term prevails over a dictionary definition or common understanding of a term. In re F.D. Processing, Inc., 119 Wash.2d 452, 458, 832 P.2d 1303 (1992).
Moreover, under section 2(2) tax includes, but is not necessarily limited to ... [the list of charges], and any monetary charge by government. (Emphasis added.) This language also suggests that the term tax has a broad meaning. Further, the term any in any monetary charge (emphasis added) means something other than similar, lending further weight to the argument that tax is defined expansively.
The meaning of language must also be determined from the enactment as a whole, with each provision read in relation to the other provisions. City of Seattle v. Dep't of Labor & Indus., 136 Wash.2d 693, 698, 965 P.2d 619 (1998); Hubbard v. Dep't of Labor & Indus., 140 Wash.2d 35, 43, 992 P.2d 1002 (2000). While the parties mainly focus on the term any monetary charge and the preceding list of charges in section 2(2) of I-695, section 2(3)'s exclusions from the term tax, i.e., higher education tuition and civil and criminal fines and charges, indicate that tax must be given a broad construction. These excluded charges are not compulsory charges for the support of government, or in the standard dictionary's terms, a forced contribution of wealth to meet the public needs of government, and there would be no need for their exclusion if tax is given its ordinary traditional meaning. Nor are these items charges which the average informed voter would think are taxes. A broad construction of tax accords with the specific exclusions and avoids rendering them superfluous.
Further, the specific list of charges which are defined as taxes in subsection 2 includes license fees. The average informed voter would not conclude that the charge for a state nurse's license, for example, is a tax in its traditional sense.
Some respondents and amici, however, rely on certain language in I-695 for the proposition that a restrictive meaning of tax is intended. The initiative uses the word imposed. Section 2(1) says [a]ny tax increase imposed by the state shall require voter approval. (Emphasis added.) The Housing Authority says that its charges for rental housing units are not imposed on those choosing to rent a unit.
Impose has as its ordinary meaning to make, frame, or apply (as a charge, tax, obligation, rule, penalty) as compulsory, obligatory, or enforcible ...: LEVY.... Webster's Third New International Dictionary 1136 (1986) Levy means to impose or collect (as a tax or tribute) by legal process or by authority: EXACT.... Id. at 1301. These common definitions are broader than the Housing Authority suggests and do not limit the term tax to its common meaning.
The Snohomish PUD and the Port Districts point to the word government in the phrase any monetary charge by government, and argue that because the word state is used (and defined) elsewhere in the initiative, government must have a different meaning from state. See Seeber v. Public Disclosure Comm'n, 96 Wash.2d 135, 139-40, 634 P.2d 303 (1981) (where certain language is used in one instance and different language in another, there is a difference in legislative intent). These respondents urge that government must pertain to governmental power rather than to proprietary power. Therefore, they reason, only charges of a governmental nature, rather than proprietary charges, are taxes. The argument is not persuasive. A charge by government is a charge by an entity. The word is used as a noun, not as an adjective.
*789 We conclude from the plain language of I-695 that tax does not have a traditional meaning, but instead has a broad meaning.
The State, the Tacoma Water respondents, and Snohomish PUD urge, however, that the term any monetary charge by government in section 2(2) is ambiguous, and therefore the court should resort to rules of statutory interpretation. However, even if one accepts the premise that the term is ambiguous, it does not follow that tax has its traditional meaning. These parties first argue that the rule of ejusdem generis applies, contending that the term should take its meanings from the specific taxes and fees preceding it. See City of Seattle, 136 Wash.2d at 699, 965 P.2d 619. They disagree, though, as to the result of applying the rule. In the State's view, traditional taxes and fees like those listed fall within the meaning of tax, i.e., those in the nature of a governmental fee or tax, but all charges by government do not. Thus, the State urges that the term should be construed to mean a compulsory charge for the support of government. The Snohomish PUD's approach is similar. Its view is that each of the eight listed charges is either a tax in the traditional sense or a regulatory fee that involves the exercise of governmental, not proprietary, power. It says that the eight charges are compulsory exactions by the state in the nature of taxes.
In the Tacoma Water respondents' view, the eight enumerated items in section 2(2) are monetary charges by government that produce general revenue for the general fund, and they urge that the term any monetary charge must be similarly limited. These respondents say that the State's definition is essentially meaningless, because virtually every government charge can be categorized as compulsory because you have to pay it if you wish to obey the law. They also want the court to reject the State's proprietary-governmental distinction. They say that, for example, cities supplying some areas of a city with clean, disease-free drinking water do so in their governmental capacity to promote the general health and safety of the citizens, but where that problem does not exist, the cities act in a proprietary capacity. Under the State's definition, these respondents say, water rates in the first situation are not taxes, while in the second they are.
The rule of ejusdem generis does not apply as any of the parties urge. It is clear that the list of eight charges on its face includes items that are not traditional taxes, such as license fees, impact fees, and permitting fees. Our inquiry here is whether, for purposes of the art. II, § 19 subject-in-title rule, the term tax has a broader meaning than its commonly understood, traditional meaning. Some of the listed items, as well as the exclusions in section 2(3), plainly establish that section 2(2) is not limited to traditional taxes, and the rule of ejusdem generis does not lead to a different conclusion.
Several of the respondents urge that extrinsic indicators of the voters' intent show that a broad meaning of tax was not intended. Assuming that, for the sake of the argument, ambiguity exists, looking to the voters pamphlet for evidence of the voters' intent would be appropriate. The Snohomish PUD says that there is nothing in the voters pamphlet to indicate that there was any intent to apply the voter approval provision to utility rates, special assessments and other proprietary charges by PUDs. Instead, the intent expressed is that of an anti-tax measure. The Port Districts similarly say that there is no mention in the ballot title, the ballot summary, or the statements in the voters pamphlet of proprietary charges by a port district. They also urge that only conventional taxes are mentioned in the title and summary. The Tacoma Water respondents say that water rates and charges are not the type of monetary charge commonly understood to be a tax under Washington common law, and the voters did not intend to include such charges within the term tax.
The Port Districts and the Tacoma Water respondents say that the purpose of I-695 was to repeal the MVET and prevent government entities from increasing taxes to make up for the loss. The Port Districts say they never received any MVET funds and have no reason to make such funds up. The Tacoma Water respondents also say they never received any MVET funds, and the term tax should be construed to encompass only charges that could replace those funds.
*790 Amicus Housing Authority makes a similar argument.
The voters pamphlet for the November 2, 1999, general election discloses that the purposes of I-695 are to eliminate outrageously expensive vehicle tabs and require voter approval for any other tax increase because we knew politicians would try to raise other taxes. Voters Pamphlet at 4. The rebuttal of the statement against the initiative explains that [o]nce vehicle tabs were lowered to $30, we knew politicians would try to raise other taxes. I-695 is carefully written and requires voter approval for tax increases, meaning politicians CAN'T impose property taxes on vehicles, a state income tax, or ANY tax without asking your permission first. Voters Pamphlet at 4.
Two things are apparent from examining the voters pamphlet and I-695. First, the stated purposes of preventing politicians from replacing MVET revenues by raising other taxes does not establish that only traditional taxes were contemplated. For example, a local transit authority might raise the cost of a bus pass to compensate for lost MVET funds allocated to public transportation. Second, to the extent that the voters pamphlet indicates that only tax measures which might replace the MVET funds would require approval, such intent is not reflected in I-695. Nothing in I-695 restricts the voter approval requirement based upon replacement of MVET revenues. Section 2 of I-695 on its face is a broad tax limitation measure. Thus, even if there were ambiguity in the term any monetary charge by government, the voters pamphlet, when compared to I-695 itself, cannot support the conclusion that tax is limited to its common meaning.
Many of the respondents and amici also argue, though, that if the term tax is defined to encompass any charge by government, absurd results ensue. If a statute is ambiguous, and therefore subject to judicial construction, a court must construe the statute to effectuate legislative intent, and in so doing `avoid a literal reading if it would result in ... absurd ... consequences.' City of Seattle, 136 Wash.2d at 697-98, 965 P.2d 619 (quoting Whatcom County v. City of Bellingham, 128 Wash.2d 537, 546, 909 P.2d 1303 (1996)). However, because the language of the initiative itself sufficiently resolves the meaning of the term, there is no ambiguity to resolve and this rule does not apply. State v. Azpitarte, 140 Wash.2d 138, 142, 995 P.2d 31 (2000).
The State also argues that by giving the term tax a broad construction the trial court failed to apply the principle that a statute will be construed to preserve its constitutionality where possible. See State v. Crediford, 130 Wash.2d 747, 755, 927 P.2d 1129 (1996). The court's broad interpretation was a key factor in the trial court's decision that I-695 is unconstitutional under art. II, § 19. However, while legislation should be construed to preserve its constitutionality where possible, given the provisions of I-695 we do not agree that the measure can be construed to apply only to traditional taxes, or that the voters intended a distinction between proprietary and governmental functions. A court should not strain to interpret [a] statute as constitutional: a plain reading must make the interpretation reasonable. Soundgarden v. Eikenberry, 123 Wash.2d 750, 757, 871 P.2d 1050 (1994).
We affirm the trial court's holding that tax has a broader meaning than its common, traditional meaning and, given I-695's exceedingly broad definition including any monetary charge by government, includes specific fees for commercial or proprietary products or services rendered or benefits received, fees, assessments other than taxes, and even utility charges by PUD's.
It follows that the trial court's holding that I-695 violates the subject-in-title rule of art. II, § 19 must be affirmed. In DeCano v. State, 7 Wash.2d 613, 110 P.2d 627 (1941), this court addressed an amendatory act which was titled An Act Relating to the rights and disabilities of aliens with respect to land, and amending.... Id. at 623, 110 P.2d 627. However, the body of the act specifically defined alien in a way which brings within its purview a whole new class of persons who are not in fact aliens in common understanding.... Id. at 624, 110 P.2d 627. The court applied the rule that `[w]ords in a title must be taken in their *791 common and ordinary meanings, and the legislature cannot in the body of an act impose another or unusual meaning upon a term used in the title without disclosing such special meaning therein.' Id. at 626, 110 P.2d 627 (quoting 59 C.J. 810). The court held that the act violated art. II, § 19.
This court applied the same rule in Petroleum Lease Properties, Inc, 195 Wash. 254, 80 P.2d 774. There, the title of the act was An act providing for the regulation and supervision of the issuance and sale of securities to prevent fraud in the sale thereof, amending.... Id. at 257, 80 P.2d 774. In the body of this amendatory act the term securities was defined to include oil or gas leases. The court said: The title gives no notice that there is to be embodied in the amendment the regulation of any matter not embraced within the meaning of the word `security' as that term is commonly understood and defined by standard dictionaries, as well as by the original securities act itself. That a gas or oil lease is not a `security' as ordinarily understood, or as defined in the original act, is self-evident. Id. at 258, 80 P.2d 774. See also Swedish Hosp. v. Dep't of Labor & Indus., 26 Wash.2d 819, 822, 830, 832, 176 P.2d 429 (1947) (title An Act giving workmen's compensation benefits to persons engaged in hazardous and extrahazardous occupations in charitable institutions violated art. II, § 19 because it did not give notice that provisions concerning nonprofit organizations and institutions were encompassed within the act) (citing DeCano and Petroleum Lease Properties).
The court in DeCano distinguished State ex rel. Port of Seattle v. Dep't of Public Serv., 1 Wash.2d 102, 95 P.2d 1007 (1939). There, in a comprehensive title the terms storage warehouse and warehousemen were used, which the court in DeCano said were broad enough to embrace all storage warehouses, including those operated by municipal corporations such as port districts. Moreover, the court noted in DeCano, the title used the phrase defining the same following those terms, which called attention to the fact that these terms were defined in the body of the statute. DeCano, 7 Wash.2d at 630, 110 P.2d 627.
As in DeCano and Petroleum Lease Properties, we affirm the trial court's holding that I-695 violates the subject-in-title rule of art. II, § 19 on the basis that the ballot title of I-695 states [s]hall voter approval be required for any tax increase without any indication in the title that tax has a meaning broader than its common meaning.[10] Nothing about this ballot title gives any notice would indicate to the voters that the contents of the initiative would include voter approval for charges other than taxes or suggest inquiry into the act be made to learn the broad meaning of tax.
The next question is whether, due to unconstitutionality under the subject-in-title clause of art. II, § 19, I-695 is unconstitutional in its entirety. A legislative act is not unconstitutional in its entirety unless invalid provisions are unseverable and it cannot be reasonably be believed that the legislative body would have passed one without the other, or unless elimination of the invalid part would render the remaining part useless to accomplish the legislative purposes. Gerberding v. Munro, 134 Wash.2d 188, 197, 949 P.2d 1366 (1998); State v. Crediford, 130 Wash.2d 747, 760, 927 P.2d 1129 (1996). A severability clause may provide the assurance that the legislative body would have enacted remaining sections even if others are found invalid. Gerberding, 134 Wash.2d at 197, 949 P.2d 1366. However, a severability clause is not necessarily dispositive on the question of whether the legislative body would have enacted the remainder of the act. Leonard v. City of Spokane, 127 Wash.2d 194, 201, 897 P.2d 358 (1995). I-695 has a severability clause.
In Petroleum Lease Properties, the court said that the act was unconstitutional so far as it attempted to bring oil and gas leases within the scope of the securities act. In DeCano, the court similarly held that so far *792 as the act tried to bring within its scope individuals not falling within the commonly understood meaning of alien, it was unconstitutional. In Swedish Hospital, the court said it would presume the legislators knew that nonprofits were included in the body of the act, but it could not presume that the legislators would have enacted the measure without the invalid portion. Therefore, the act was invalidated in its entirety.
Here, we hold that section 2 of I-695 is invalid under the subject-in-title clause of art. II, § 19.
The trial court also ruled that section 3 of I-695 contains subjects not identified in the ballot title. Where an act contains provisions not fairly encompassed within the title, such provisions are void. Power, 39 Wash.2d at 200, 235 P.2d 173. Although the title of I-695 refers to repeal of existing vehicle taxes, some of the repealed statutes imposed no tax or fee but instead allocated proceeds of the license tab fees to police, fire and other purposes and established accounts and funds for deposit and withdrawal of these moneys.[11] Repeal of these statutes, the trial court ruled, deprived named programs and government agencies of their present share of the funding, a result not identified in the ballot title. Other repealed statutes removed exemptions from motor vehicle taxes, and their repeal increased taxes.[12] This increase, the trial court said, also was not disclosed in the title. Accordingly, the trial court held, repeal of these statutes was unconstitutional under art. II, § 19.
The State argues, however, that the title need not provide the details contained within the measure; that these subjects are not separate subjects because the title gives notice that existing vehicle taxes are repealed and the average informed voter would not require further notice that such repeal would lead to a loss of revenue; and finally, that, where by statute the ballot title is limited in length, to invalidate the initiative on the basis that it does not provide sufficient detail would be contrary to the right of the people to legislate. In its reply brief, the State adds that the voters pamphlet provided adequate notice of these provisions, and the public therefore had sufficient notice.
Given I-695's general title, section 3 falls within it. The title provides sufficient notice that the initiative repealed taxes, and thus, notice that decreased revenues and loss of funding would result. Removal of exemptions from a tax does not alter the tax itself. The small increase in some license fees as a result of repeal of the MVET is sufficiently related to the repeal to bring them within the general title. While section 2 of I-695 violates the subject-in-title rule of art. II, § 19, section 3 does not.
2. Article II, section 1(b)
The State and the Campaign contend the trial court erred in holding that section 2 of I-695 violates art. II, § 1(b)'s requirement that four percent of the voters sign a referendum petition. They argue that under section 2 of I-695 any measure imposing increased taxes (as defined in I-695) becomes conditional legislation subject to voter approval. Amalgamated Transit, the Cities, Tacoma Water, and the Clean Air Agency contend the trial court's ruling is correct, arguing that section 2 establishes an unconstitutional referenda process.
The Seventh Amendment to the Washington State Constitution, adopted by the voters in 1912, established the initiative and referendum powers. The state constitution provides in part:
The legislative authority of the state of Washington shall be vested in the legislature... but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature.

*793 (a) Initiative: The first power reserved by the people is the initiative....
(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature... either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted.... The number of valid signatures of registered voters required on a petition for referendum of an act of the legislature or any part thereof, shall be equal to or exceeding four percent of the votes cast for the office of governor at the last gubernatorial election preceding the filing of the text of the referendum measure with the secretary of state.
Const. art. II, § 1. The filing of a referendum petition suspends the effectiveness of the statute until 30 days after the next general election, if the voters approve the statute; and a measure referred by the Legislature takes effect 30 days after the next general election if approved by the voters. Const. art. II, § 1(d).
Article II, section 1(b) defines the legislative, initiative and referendum powers of state government. Citizens for Financially Responsible Gov't v. City of Spokane, 99 Wash.2d 339, 349, 662 P.2d 845 (1983).
I-695, section 2(1) provides that [a]ny tax increase imposed by the state shall require voter approval. The trial court reasoned that while section 1 of I-695 enacted specific changes in the amount, structure and distribution of a particular tax, and is accordingly a proper legislative subject of an initiative measure (as is section 3), section 2 automatically suspends in the future every tax-related action of government until the voters approve or disapprove of the action. The court reasoned that section 2 is therefore universal, constitutes a presumptive veto, and establishes a referendum. Then, the court reasoned, as a universal referenda provision section 2 conflicts with art. II, § 1(b)'s requirement that a referendum petition must be signed by four percent of the registered voters. Section 2 mandates a vote even though there may be no public opposition or controversy over a particular tax-related action. The court then reasoned that it would require redrafting the measure in order to uphold it as to local taxing measures, and declined to engage in such redrafting.
We uphold the trial court's ruling on the basis that section 2 establishes a referendum process applying to every piece of future tax legislation. Article II, section 1 begins by stating that the legislative power is vested in the Legislature, and then identifies the powers reserved to the people by the Seventh Amendment the initiative and referendum powers. Article II, section 1(b) then describes how the reserved powers of the people are to be exercised. Where the people seek a referendum on legislation passed by the Legislature, art. II, § 1(b) requires that four percent of the voters petition for referendum before a referendum election must be held. The other method by which a referendum election may be held is where the Legislature decides to refer a measure it has passed to the people for their vote.
Under section 2 of I-695 all state tax measures passed by the legislature are automatically subject to voter approval. Article II, section 1(b) states that the referendum power may be ordered on any act, bill, law, or any part thereof passed by the legislature. (Emphasis added.) Section 2 of I-695 effectively authorizes mandatory referendum elections on all future tax legislation passed by the Legislature where the Legislature has not referred the legislation[13] and where four percent of the registered voters have not signed petitions for referendum on the particular legislation passed by the Legislature. Under section 2 a tax measure passed by the Legislature is suspended until and unless the voters approve it, as is the case when the people petition for referendum. As did the trial court, we conclude that section 2 calls for universal referenda on all legislation which would impose increased taxes without regard to whether a particular piece of legislation would engender enough interest or *794 opposition for four percent of the voters to petition for referendum.
Not only does section 2 fail to comply with the art. II, § 1(b) procedures for referenda, it also was adopted in an improper way. The state constitution does not provide that the initiative power can be used to alter the method by which the referendum power is exercised. The people in exercising their reserved powers must conform to the constitution, just as the Legislature must do when enacting legislation. Here, exercise of the initiative power to enact section 2 has the effect of replacing the referendum petition process for any future state taxing legislation. The initiative process cannot be used to amend the constitution. Gerberding, 134 Wash.2d at 210 n. 11, 949 P.2d 1366. Article XXIII sets forth the method by which the constitution may be amended and requires that amendments be proposed by the Legislature.
The State argues, though, that the trial court erred in characterizing the effect of section 2 of I-695 as effecting a permanent suspension of future tax acts. See CP at 836. The State points out I-695 is a statute which cannot permanently bind the Legislature. After two years, the Legislature can repeal the act, and within two years can, by a two-thirds vote, amend it. Const. art. II, § 1(c). The State reasons that this constitutionally based deference does not amount to establishment of an unauthorized article II referendum.[14]
While I-695 may not have permanent effect, depending upon future legislative action, that fact does not resolve the question whether section 2 constitutes a referendum. Every measure voted upon by the people and passed, whether by initiative or referendum, is subject to the same constitutional strictures; all are subject to amendment by a two-thirds vote during two years after enactment and subject to repeal or amendment after that time. Moreover, this court has rejected the premise that substantive amendments contained in an appropriations bill were not subject to art. II, § 37 because budget bills have only a two-year duration. Flanders v. Morris, 88 Wash.2d 183, 190, 558 P.2d 769 (1977). Constitutional provisions apply even if a measure does not have permanent effect.
The primary argument of the State and the Campaign is that the trial court's analysis is in error because I-695 is not an automatic referendum provision, but instead establishes a state policy that voter approval must be sought as a condition to the effectiveness of any new tax or tax increase. Appellants argue that under section 2 no direct legislation is required for future tax increases; instead tax increases imposed by the Legislature must receive the permission of the voters before taking effect. They maintain that such conditional legislation is valid.
As noted, the people act in a legislative capacity when enacting an initiative. Belas, 135 Wash.2d at 920, 959 P.2d 1037. Enacting conditional legislation is a legislative power. See Brower, 137 Wash.2d at 56, 969 P.2d 42. Generally, the question of the validity of conditional legislation arises when it is claimed that the Legislature has unconstitutionally delegated its legislative authority. Under art. II, § 1, [t]he legislative authority of the State is vested in the Legislature... and it is unconstitutional for the Legislature to abdicate or transfer its legislative function to others. Brower, 137 Wash.2d at 54, 969 P.2d 42. However:
[C]onditioning the operative effect of a statute upon a future event specified by the Legislature does not transfer the state legislative power to render judgment to the persons or entity capable of bringing about that event. The Legislature, itself, determines the statute would be expedient only in certain circumstances. The power to make this judgment is not transferred merely because the circumstances may arise at the discretion of others. The substance of the act is complete in itself and the Legislature is the body which rendered *795 the judgment as to the expediency of conditioning the operation of the statute upon the specified event.
Brower, 137 Wash.2d at 54, 969 P.2d 42 (quoting Diversified Inv. P'ship v. Dep't of Soc. & Health Servs., 113 Wash.2d 19, 28, 775 P.2d 947 (1989)); see also Royer v. P.U.D. No. 1, 186 Wash. 142, 56 P.2d 1302 (1936); State v. Storey, 51 Wash. 630, 99 P. 878 (1909).
Here, appellants contend, the voters acted as legislators and determined that tax measures would be expedient only if approved by the voters. The State urges that although courts in other states are split on the question whether a condition of legislation may be statewide voter approval, the better view is that such a condition is constitutional. The cases that the State cites, however, each concern a specific piece of legislation conditioned on voter approval. See In re Opinions of the Justices, 232 Ala. 60, 166 So. 710, 714 (1936) (conditioning an act to legalize and tax alcoholic liquors on statewide voter approval did not constitute an unconstitutional delegation of legislative power); Hudspeth v. Swayze, 85 N.J.L. 592, 89 A. 780, 783-84 (1914) (conditioning an act concerning grand and petit juries on statewide voter approval did not constitute an unconstitutional delegation of legislative power); Smith v. City of Janesville, 26 Wis. 291 (1870) (act authorizing taxation of shares of stock in a national bank conditioned on statewide voter approval); State v. Scampini, 77 Vt. 92, 59 A. 201, 203 (1904) (legislature can condition effective date of act prohibiting sale of intoxicating liquor on statewide vote of people); People v. Collins, 3 Mich. 343, 361-62 (1854) (equally divided court on issue whether legislature can constitutionally submit an act prohibiting sale of intoxicating beverages to a statewide vote); cf. Marr v. Fisher, 182 Or. 383, 187 P.2d 966, 968-70 (1947) (act lowering income taxes conditioned on voter approval of measure establishing a sales tax did not involve unconstitutional delegation of legislative authority).
None of these cases cited by the State involves the question here whether a legislative body (here the people) can require voter approval as a condition to all future taxing legislation passed by the Legislature, as opposed to a specific piece of legislation. Washington cases approving conditional legislation (but not involving statewide voter approval as the condition) also involve specific existing legislation. E.g., Brower, 137 Wash.2d 44, 969 P.2d 42; Diversified Inv. P'ship v. Dep't of Soc. & Health Servs., 113 Wash.2d 19, 775 P.2d 947; Royer v. P.U.D. No. 1, 186 Wash. 142, 56 P.2d 1302; State v. Storey, 51 Wash. 630, 99 P. 878. Here, section 2 encompasses all future state legislation imposing increased taxes as defined in I-695.
Other cases cited by the State include Manly v. City of Raleigh, 57 N.C. 370, 377 (1859), which involved referral of a measure for a local vote but contains dictum approving of conditioning measures on a statewide vote. The North Carolina Supreme Court has noted more recently that the state constitution no longer contains a provision reserving all powers not granted to the legislature to the people (as did former Art. I, § 41 of the North Carolina State Constitution), and absent such a provision the legislature must legislate, not the people. Joy time Distribs. & Amusement Co. v. State, 338 S.C. 634, 528 S.E.2d 647 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1719, 146 L.Ed.2d 641 (2000). The court rejected the argument that an act depending upon approval by the state's voters, there an act pertaining to continuance of video gaming, could be valid as contingent legislation. The court reasoned that the act left to a majority of the voters the determination of expediency, and thus was an unconstitutional delegation of legislative authority.
The State also cites In re Mun. Suffrage to Women, 160 Mass. 586, 36 N.E. 488 (1894), where the majority held in an advisory opinion to the Massachusetts House of Representatives that it would be unconstitutional to submit to a statewide vote an act granting women the right to vote. The majority reasoned that although the constitution which the people adopted declared that all power originally resided in the people, authority was vested by the constitution in the various branches of government including the Legislature, as `their substitutes and agents,' with no reservation to the people of the right of *796 supervision. Id. 36 N.E. at 489. The majority said that the legislative power cannot be delegated, and that although conditional legislation may be passed by the Legislature, a measure cannot be conditioned on statewide voter approval because it would mean that the legislative department declines to take the responsibility of passing the law; but the law has force, if at all, in consequence of the votes of the people. Id. at 489-90.[15] The State quotes the dissenting opinion of Oliver Wendell Holmes, who found nothing in the state constitution prohibiting such a law, and who reasoned that the Legislature should be able to exercise its discretion by taking the opinion of its principal [the people], if it thinks that course to be wise. Id. at 491-92 (Holmes, J., dissenting). The State reasons that, as Holmes argued, there is no unconstitutional delegation of legislative authority where the agents, the legislators, obtain the final decision from the principals (the people) on selected matters of important public policy questions such as the expediency of tax legislation. See also Hudspeth, 89 A. at 784.
In urging this analysis, the State points to language in art. I, § 1, which states that [a]ll political power is inherent in the people....[16] The Campaign also relies heavily on this language. The State says that it seems likely that the framers of our state constitution would have found it appropriate for the legislators or agents to refer matters of important public policy to their principals. The State then urges that because Washington's voters adopted the rights of initiative and referendum, thus allowing for direct legislation, and provided for the Legislature to commence direct legislation by referendum, there is no demonstrated intent in our constitution to limit any preexisting legislative authority to enact legislation conditioned on voter approval. Since the people act in a legislative capacity in enacting law through the initiative process, their authority is similarly unlimited. Accordingly, in the State's view, section 2's voter approval requirement does not fall within art. II, § 1. The State also reasons that there is no art. II, § 1 issue here because the legislative power of the state is plenary, and any restriction on that power must be found in the constitution. PUD No. 1 v. Taxpayers & Ratepayers of Snohomish County, 78 Wash.2d 724, 728, 479 P.2d 61 (1971). The State says that there is no provision in the constitution restricting the legislative power to require that tax measures be submitted to the voters for approval.
We do not accept the premise that because nothing in the constitution expressly restricts legislative power to condition state measures on voter approval, such power exists and there is no issue arising in this case under art. II, § 1. There is no question that under art. II, § 1 the Legislature cannot delegate its legislative authority. As noted, `[I]t is unconstitutional for the legislature to abdicate or transfer to others its legislative function.' King County v. Taxpayers of King County, 133 Wash.2d 584, 605, 949 P.2d 1260 (1997) (quoting Keeting v. PUD No. 1 of Clallam County, 49 Wash.2d 761, 767, 306 P.2d 762 (1957)); accord Brower, 137 Wash.2d at 54, 969 P.2d 42. The question here is not whether any other provision in the constitution prohibits conditioning state measures on voter approval, but whether such a condition unconstitutionally delegates legislative power in violation of art. II, § 1.
As to the argument that the people have the inherent authority to approve legislation, while all political sovereignty initially resided with the people in this state, they expressly surrendered much of that sovereignty to the state government when they adopted the constitution. Under our form of government, ultimate sovereignty, so far as the state is concerned, rests in its people, and so long as the government established by them exists, that sovereignty remains with them, except in so far as they have expressly surrendered it to a higher sovereignty. Love *797 v. King County, 181 Wash. 462, 467, 44 P.2d 175 (1935) (also citing and quoting art. I, § 1) (emphasis added). When the people adopted the constitution, they vested legislative power in the Legislature under art. II, § 1. Later, when the Seventh Amendment was adopted, the people reserved to themselves the initiative and referendum powers, specifically setting forth the manner in which those powers may be exercised. However, [t]he right to act directly through either the initiative or referendum is not an inherent right of the people. In fact, that right was nonexistent under our state constitution until Amendment 7 was adopted in 1912. Ruano v. Spellman, 81 Wash.2d 820, 823, 505 P.2d 447 (1973).
Having surrendered legislative power with adoption of the constitution, the people did not retain inherent authority to approve state legislation, and the initiative and referendum powers are not the source of inherent authority either. Contrary to the position of the State and the Campaign, the people do not possess the inherent authority to approve state legislation.
The Campaign claims, though, that this court has noted the extensive power of initiative as: [T]he people in their legislative capacity are superior to all other branches of government, superior to the legislature which made this law; in fact, supreme in their legislative capacity. State ex rel. Berry v. Superior Ct., 92 Wash. 16, 26, 159 P. 92 (1916). The quote is taken out of context and its meaning thereby altered. The issue was whether the proponents of an initiative included argument in a preamble in the measure that constituted argument which under enabling statutes was unlawfully included within the text. The court held the preamble was argument advanced by the proponents in advocacy of the measure which, under the facilitating law, properly belonged in the voters pamphlet and paid for by the proponents. The quoted material appears in the court's explanation that a proponent of an initiative is not a legislator, and in context states:
But, it is said, the people in their legislative capacity are superior to all other branches of government, superior to the legislature which made this law; in fact, supreme in their legislative capacity. The people in their legislative capacity are not, however, superior to the written and fixed constitution.
Id. at 26, 159 P. 92.
The next question is whether the people acquired the power to condition legislation on voter approval when they reserved the initiative and referendum rights. The answer begins with identifying the scope of the Legislature's power before the people's adoption of the Seventh Amendment, and determining whether the Legislature could then condition state tax measures on a vote of the people. A number of courts holding that conditioning an act on statewide voter approval is unconstitutional have done so on the basis that the legislature cannot delegate its legislative power to make law. See, e.g., People ex rel. Thomson v. Barnett, 344 Ill. 62, 176 N.E. 108 (1931); Barto v. Himrod, 8 N.Y. (4 Seld.) 483, 1853 WL 6039 (1853) (leading case); Brawner v. Curran, 141 Md. 586, 119 A. 250 (1922); Akin v. Director of Revenue, 934 S.W.2d 295 (Mo.1996); Opinion of the Justices, 143 N.H. 429, 725 A.2d 1082 (1999); cf. In re Request of Governor Janklow, 530 N.W.2d 367 (S.D.1995) (while legislature has authority to refer its own acts, it does not have authority to refer acts increasing rate of taxation). Courts have reasoned that when a legislature conditions legislation solely on a vote of the people, it relinquishes the decision to pass a law to the voters, thus delegating its legislative authority to make law to the voters. E.g., Opinions of the Justices, 143 N.H. 429, 725 A.2d 1082; Brawner v. Curran, 141 Md. 586, 119 A. 250 (1922); Barto, 8 N.Y. 483; Joytime Distribs., 338 S.C. 634, 528 S.E.2d 647. As the court explained in Opinions of the Justices:
If the people are to say, by way of popular vote, whether or not an act shall become law, they are put in the place of the legislature. The vote of the people becomes the determining factor whether an act shall be the law or not, not simply a contingency upon which certain things are or are not to be done under the law.
725 A.2d at 1092. In Barto, 8 N.Y. at 491, the court reasoned:

*798 The wisdom or expediency of the free school act, abstractly considered, did not depend on the vote of the people. If it was unwise or inexpedient before that vote was taken, it was equally so afterwards. The event on which the act was made to take effect was nothing more than the vote of the people on the identical question which the constitution makes it the duty of the legislature itself to decide. The legislature has no power to make a statute dependent on such a contingency, because it would be confiding to others that legislative discretion which they are bound to exercise themselves, and which they can not delegate or commit to any other[s] ... to be exercised.
An important element in the analysis in these cases is that the people in the particular state reserved no legislative powers[17] or that the state constitution did not provide for referrals of measures except in specific circumstances or both. E.g., In re Mun. Suffrage to Women, 160 Mass. 586, 36 N.E. 488 (1894); Barto, 8 N.Y. 483 (people voluntarily surrendered legislative power when adopting state constitution, limited only by provision reserving power to vote on laws for the contracting of debt); Joytime Distribs., 338 S.C. 634, 528 S.E.2d 647 (present state constitution does not contain a clause reserving to the people the power to legislate); Opinion of the Justices, 725 A.2d at 1087 (referenda on legislation are unconstitutional in New Hampshire unless specific constitutional provision permits).
As have these courts, we conclude that prior to the people's adoption of the initiative and referendum powers in this state, the Legislature lacked the authority to condition measures on a vote of the people. Submitting a measure to the voters subject only to their approval would have transferred the determination of expediency of the measure to the voters, thus constituting an unlawful delegation of legislative power which the people themselves had yielded to the Legislature in the state constitution. It would in effect have allowed a referendum vote on matters passed by the Legislature at a time when our state constitution did not permit referenda on legislative measures.[18]
With adoption of the initiative and referendum powers, which themselves are not inherent powers, Ruano, 81 Wash.2d at 823, 505 P.2d 447, the people reserved the right to legislate exercis[ing] the same power of sovereignty as that exercised by the legislature in the passage of a statute. Love v. King County, 181 Wash. 462, 469, 44 P.2d 175 (1935). Because the Legislature lacked power to condition state measures solely on statewide voter approval, the same is true of the people exercising their legislative power once the initiative and referendum rights were reserved. Neither the Legislature nor the people acting in their legislative capacity has the power to condition a state law solely on voter approval, and accordingly section 2 is invalid, even if one were to accept the appellants' argument that section 2 establishes a conditional legislation process.
This does not mean, however, that the people lack the authority to approve or disapprove legislation under the reserved initiative and referendum powers. They do. However, that right must be exercised in conformity with the constitutionally mandated procedures, including the four percent voter signature requirement each time the people petition for a referendum on a piece of legislation the Legislature has passed. Nor does it mean that the Legislature cannot refer a measure to the people for a statewide vote. Plainly it can do so, not, however, as conditional legislation, but rather through the referendum process set forth in art. I, § 1(b).
We note there are other difficulties with the argument that section 2 merely establishes a valid conditional legislation process. If carried to its logical conclusion, it would mean that the voters could pass several initiatives, each requiring every measure of a *799 certain class passed by the Legislature to be submitted to the voters for approval. In a piecemeal way, all, or nearly all, areas of legislation could thereby be removed from the Legislature's authority. Such a result would be inconsistent with the representative form of government in this state. While we do have direct legislative authority of the people exercisable through the reserved initiative and referendum powers, the constitution also vests legislative authority in the Legislature as a representative body. Also, even though some courts have upheld a voter approval requirement as a condition of a particular measure, the State and the Campaign cite no cases, and none have been found, permitting conditioning all future state measures of a certain class on voter approval absent a constitutional amendment to that effect. Finally, under section 2 of I-695 the legislation that is allegedly conditioned is not legislation enacted by the people acting in their legislative capacity but is instead legislation enacted by the Legislature. Thus, the legislative body passing the tax legislation is not the legislative body determining that effectiveness would be expedient only on approval of the voters.
The Campaign claims, though, that historically initiatives have provided similar tax limits while allowing higher limits as exceptions if approved by voters. The Campaign also says that the Legislature has often conditioned local taxing authority on voter approval, citing numerous statutes.
The initiatives referred to by the Campaign are Initiatives 64, 94, 114, and 129, and all concern taxation of real and personal property and limiting the rate of taxation while allowing for special levies upon voter approval. See RCW 84.52.050 (all the initiatives have to do with this statute). The Campaign's reply brief expands upon the history of this type of voter approval, noting it ultimately has been adopted as art. VII, § 2 of the state constitution. However, such voter approval requirements are unlike section 2 of I-695. First, only a specified type of tax is at issue, not all future tax measures. Second, the voter approval provided for is only for local, not statewide, tax levies. As to the statutes cited, they also concern local, not statewide, voter approval provisions.
The Campaign maintains, though, that this court has upheld statutes conditioned on voter approval. The case it primarily relies upon concerns a local option law relating to sale of alcoholic beverages, not statewide voter approval. State v. Donovan, 61 Wash. 209, 210, 112 P. 260 (1910). As an early case noted, approval of such local option laws at that time was almost universal. Ex parte Beck, 162 Cal. 701, 709, 124 P. 543 (1912) (citing numerous cases, including Donovan). The California court also noted that such laws relate to subjects which, like retailing alcoholic beverages or the running of cattle at large on the highways `may be differently regarded in different localities, and they are sustained on what seems to us the impregnable ground, that the subject, though not embraced within the ordinary power of the municipalities to make by-laws and ordinances, is nevertheless within the class of police regulations, in respect to which it is proper that local judgment should control.' Beck, 162 Cal. at 708-09, 124 P. 543 (quoting Cooley's Const. Lim. at 173-74); see also Opinions of the Justices, 725 A.2d at 1090-91 (noting an exception to the rule that enacting a law subject only to voter approval is an unconstitutional delegation of legislative authority; Legislature may delegate such authority where localities and matters of local concern are involved).
While not concerning local voter approval, the opinion in Am. Fed'n of Teachers, Yakima Local 1485 v. Yakima Sch. Dist. No. 7, 74 Wash.2d 865, 869, 447 P.2d 593 (1968) also recognizes the principle that an exception to the nondelegation rule exists where delegation to municipal corporations is involved:
While the rule is fundamental that the power to make laws cannot be delegated, the creation of municipal corporations to exercise local self-government has never been deemed to violate this principle. Such legislation is not regarded as a transfer of general legislative power, but rather as a grant of the authority to prescribe local regulations, supported by immemorial practice, but subject, of course, to the interposition *800 of the superior in cases of necessity. Conferring proper powers upon municipal corporations forms an exception to the rule which forbids the legislature to delegate any of its power to subordinate divisions.
Id. at 869, 447 P.2d 593 (emphasis omitted) (quoting 2 Eugene McQuillin, The Law of Municipal Corporations § 4.09 (3d ed.1966)).
We hold that section 2 of I-695 violates the four percent signature requirement of art. II, § 1(b) because it effectively establishes a referendum procedure applying to every piece of future taxing legislation without regard to the four percent signature requirement. Section 2 does not merely provide for conditional legislation; it changes the way in which a piece of legislation is enacted.
The next issue that the parties dispute is whether section 2's unconstitutionality under art. II, § 1(b) requires invalidation of section 2 or I-695 in its entirety. The trial court reasoned that it would require redrafting I-695 to avoid the unconstitutionality. The State contends that even if section 2 is invalid as to statewide measures, it is valid as to local taxing measures.
As a general proposition, it appears the State could impose a local voter approval requirement. The power to tax does not exist in a municipality absent a legislative grant of authority, City of Seattle v. Roger's Clothing for Men, Inc., 114 Wash.2d 213, 221, 787 P.2d 39 (1990), and the State retains the power to alter the delegated power to tax, Snow's Mobile Homes, Inc. v. Morgan, 80 Wash.2d 283, 287-88, 494 P.2d 216 (1972). However, since section 2 and I-695 are unconstitutional in their entirety under art. II, § 19, section 2 retains no validity with respect to local taxing measures.[19]
3. Article II, section 37
Article II, section 37 provides that [n]o act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length. This provision is to be given a reasonable construction. In re Dietrick, 32 Wash. 471, 477, 73 P. 506 (1903). The first purpose of this provision is to `avoid[] confusion, ambiguity, and uncertainty in the statutory law through the existence of separate and disconnected legislative provisions, original and amendatory, scattered through different volumes or different portions of the same volume.' Flanders v. Morris, 88 Wash.2d 183, 189, 558 P.2d 769 (1977) (quoting State ex rel. Gebhardt v. Superior Ct., 15 Wash.2d 673, 685, 131 P.2d 943 (1942)); see State ex rel. Wash. Toll Bridge Auth. v. Yelle, 54 Wash.2d 545, 342 P.2d 588 (1959). Stated more succinctly, this purpose is to disclose the effect of the new legislation. State v. Thorne, 129 Wash.2d 736, 753, 921 P.2d 514 (1996). The result of compliance with art. II, § 37 should be `that no further search will be required to determine the provisions of such section as amended.' Flanders, 88 Wash.2d at 189, 558 P.2d 769 (quoting Gebhardt, 15 Wash.2d at 685, 131 P.2d 943).
However, an act is exempt from the requirements of art. II, § 37 provided the act is complete in itself, independent of prior acts, and stand[s] alone as the law on the particular subject of which it treats. State ex rel. Living Servs., Inc. v. Thompson, 95 Wash.2d 753, 756, 630 P.2d 925 (1981). If, though,
the new act is not complete but refers to a prior statute which is changed but not repealed by the new act, one is required to read both statutes before the full declaration of the legislative will on the subject can be ascertained. This causes the very obscurity and tendency to confuse which the constitutional provision seeks to prevent, hence violates the constitution.
State ex rel. Living Servs., 95 Wash.2d at 757, 630 P.2d 925. Thus, the first test to determine whether art. II, § 37 is violated is related to the first purpose of the provision: Is the new enactment such a complete act that the scope of the rights or duties created *801 or affected by the legislation action can be determined without referring to any other statute or enactment? Wash. Educ. Ass'n v. State, 93 Wash.2d 37, 40, 604 P.2d 950 (1980) (citing Naccarato v. Sullivan, 46 Wash.2d 67, 74, 278 P.2d 641 (1955)); see Thorne, 129 Wash.2d at 753-54, 921 P.2d 514.
The second purpose of the constitutional provision is the necessity of insuring that legislators are aware of the nature and content of the law which is being amended and the effect of the amendment upon it. Flanders, 88 Wash.2d at 189, 558 P.2d 769. Or, stated another way, to disclose the act's impact on existing laws. Thorne, 129 Wash.2d at 753, 921 P.2d 514. The second test for compliance with art. II, § 37 is, therefore, [w]ould a straightforward determination of the scope of rights or duties under the existing statutes be rendered erroneous by the new enactment? Wash. Educ. Ass'n, 93 Wash.2d at 41, 604 P.2d 950 (citing Weyerhaeuser v. King County, 91 Wash.2d 721, 731, 592 P.2d 1108 (1979)); see Thorne, 129 Wash.2d at 753-54, 921 P.2d 514.
This court said in Spokane Grain & Fuel Co. v. Lyttaker, 59 Wash. 76, 78, 109 P. 316 (1910):
The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the change in the laws. An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not re-published, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision, and cannot be held to be prohibited by it without violating its plain intent.
(quoting Judge Cooley in People ex rel. Drake v. Mahaney, 13 Mich. 481 (1865)).
Article II, section 37 applies to initiatives. Thorne, 129 Wash.2d at 753, 921 P.2d 514.
The trial court ruled that I-695 is not a complete act in itself, and that it renders existing statutes erroneous. As to the second test, the trial court reasoned that the initiative fails to identify by number many statutes which are directly affected and modified by I-695.
The State contends that the voter approval provision meets the two tests for compliance with art. II, § 37. First, the State argues, it is a complete provision that can be understood without reference to any other statutes; it is unnecessary to read any other statute to understand the voter approval requirement. The State maintains that the State can articulate the voter approval requirement in the body of legislation, and local governments can implement the requirement under existing authority. The State adds that if there are ambiguities as to the requirements for voter approval, these can be resolved in the same way ambiguities in statutes are generally resolved through executive and legislative implementation subject to judicial review. The State points out that the Administrative Procedure Act, chapter 34.05 RCW; the Open Public Meetings Act, chapter 42.30 RCW; and the State Environmental Policy Act of 1971, chapter 43.21 RCW are overlay acts which restrict other laws, and they have been the subject of many lawsuits, but are not any less complete.
As to the second test used to analyze an art. II, § 37 question, the State says that I-695 does not render existing statutes erroneous. It says that rather than alter or amend other laws, I-695 provides a requirement that is not addressed by other laws. The State compares this case to cases addressing Initiative 593, the three strikes initiative. That initiative imposed a new, mandatory life sentence on persistent offenders. Defendants argued that the initiative was void because it unconstitutionally amended existing statutes concerning maximum sentences without setting them forth. Thorne, 129 Wash.2d at 752, 921 P.2d 514; State v. Manussier, 129 Wash.2d 652, 662-63, 921 *802 P.2d 473 (1996). The court reasoned in these cases that where the new enactment is a complete act, the fact that it renders erroneous existing statutes, in the sense they are impliedly amended (or modified) by the new enactment, no violation of art. II, § 37 occurs. Thorne, 129 Wash.2d at 755, 921 P.2d 514; Manussier, 129 Wash.2d at 664-65, 921 P.2d 473. A complete act, not revisory in character, is not rendered unconstitutional by article II, section 37, even though it may by implication operate to change or modify prior acts. Manussier, 129 Wash.2d at 664-65, 921 P.2d 473 (citing Wash. Educ. Ass'n, 97 Wash.2d at 905, 652 P.2d 1347). The constitutional provision is not `intended to prohibit the passage of a law which declared fully its provisions without direct reference to any other act, although its effect should be to enlarge or restrict the operation of some other statutes.' Thorne, 129 Wash.2d at 755, 921 P.2d 514 (quoting Wash. Educ. Ass'n, at 906, 652 P.2d 1347) (quoting Spokane Grain & Fuel Co., 59 Wash. at 80-81, 109 P. 316).
Although a complete act may modify, and thus render erroneous, an existing statute, this does not contravene the purpose of art. II, § 37, to protect the members of the Legislature against fraud and deception. Thorne, 129 Wash.2d at 756, 921 P.2d 514.
The Campaign generally agrees with the State's arguments, reasoning among other things that I-695 applies to every tax, and thus does not render other taxing authorities superfluous, contrary to the trial court's ruling. The Campaign says that where violations of art. II, § 37 have been found, the acts were unintelligible. See Thorne, 129 Wash.2d at 753, 921 P.2d 514. For example, the Campaign cites Flanders, where an uncodified appropriations bill which provided a new substantive restriction on public assistance was held to violate art. II, § 37. As the court there noted, one seeking to know the law on the subject would never find the restriction in the public assistance statutes, and would have to look under an appropriations title in the uncodified session laws to find the substantive restriction. Flanders, 88 Wash.2d at 189, 558 P.2d 769. This kind of constitutional infirmity is not found in I-695, the Campaign urges. The Campaign says the voter approval requirement of I-695 is completely declared in the measure, and one need look no further. The Campaign also says that all the preexisting authority of respondents remains, but it is now further conditioned.[20]
Amalgamated Transit and the Tacoma Water respondents rely on Weyerhaeuser Co. v. King County, 91 Wash.2d 721, 731, 592 P.2d 1108 (1979) for the proposition that the test for whether a new enactment is an amendment which must set forth the text of existing statutes is whether [the new act] changes [the] prior act in scope and effect. Amalgamated Transit says that I-695 substantially alters the scope and effect of many statutes relating to voter approval of local enactments without setting them forth. For example, Amalgamated Transit says that one reading RCW 35A.11.090, concerning noncharter cities and referenda on tax levies, would be unaware that I-695 has altered this statute. The Tacoma Water respondents say that the scope and effect of provisions in Titles 35 RCW and 57 RCW, relating to these respondents' authority and duties to set and collect water rates and charges, is changed by I-695. The Tacoma Water respondents say that like the situation in Weyerhaeuser, I-695 deprived them of most of their authority to set rates and charges. Although not relying on Weyerhaeuser, the Port Districts make a similar argument, i.e., that comprehensive statutory schemes exist concerning port districts authorization to negotiate leases, set charges and tariffs, and to impose assessments. They maintain that I-695's imposition of a public vote fundamentally *803 conflicts with the prescribed legislative processes, and that I-695 cannot amend the power of Port Districts without setting forth the amended statutes in full. The Port Districts particularly rely on Wash. Educ. Ass'n, 93 Wash.2d 37, 604 P.2d 950.
Turning first to Weyerhaeuser, that opinion does say that the test is whether a new act changes a prior act in scope and effect. The court in Weyerhaeuser held that a section of an act amending the Forest Practices Act of 1974(FPA), RCW 76.09.010-.280 amended the Shoreline Management Act of 1971(SMA), chapter 90.58 RCW, without setting forth the text of the SMA. The new enactment prohibited imposition of any regulations other than Department of Natural Resources' regulations on shoreline forest practices, contravening the intent of the SMA that shoreline master programs control. It also deprived local governments of enforcement power under the SMA by prohibiting any enforcement other than by procedures in the FPA. The court reasoned that the effect of the new enactment was to substantially change the scope and effect of the SMA without changing the language of the SMA to reflect the changes. 91 Wash.2d at 731-32, 592 P.2d 1108. The court in Weyerhaeuser said that the new enactment could not be understood without reference to both the FPA and SMA, and was therefore not a complete act and not excepted from the art. II, § 37 requirement. Id. at 732, 592 P.2d 1108.
If some of its statements are taken literally, Weyerhaeuser is inconsistent with the body of law in this area. As the dissent pointed out, acts which are exempt from the requirement of art. II, § 37 are:
(1) [C]omplete acts which repeal prior acts or sections thereof on the same subject; (2) complete acts which adopt by reference provisions of prior acts; (3) complete acts which supplement prior acts or sections thereof without repealing them; [and] (4) complete acts which incidentally or impliedly amend prior acts.
Weyerhaeuser, 91 Wash.2d at 738, 592 P.2d 1108 (Dolliver, J., dissenting) (quoting Naccarato v. Sullivan, 46 Wash.2d 67, 75, 278 P.2d 641 (1955)). As the dissent pointed out, the lead case on the meaning of art. II, § 37 is Spokane Grain. The court there said:
But how often must we look to two or more acts to ascertain the full declaration of the legislative will. No one will for a moment doubt the power of the legislature to exempt homesteads by one act, household goods by another, farming implements by a third, and so on; yet the full declaration of the legislative will on the subject of exemptions could only be gathered by referring to these several acts. Followed to its logical conclusion, this argument would compel the legislature to embody in a single enactment, or in amendments thereto, all legislation relating to a single subject. Such was not the object or purpose of the provision in question. So long as a legislative act is complete in itself and does not tend to mislead or deceive, it is not violative of the constitution.
Spokane Grain, 59 Wash. at 84, 109 P. 316 quoted in Weyerhaeuser, 91 Wash.2d at 739, 592 P.2d 1108 (Dolliver, J., dissenting).
Recognizing that the dissent did not prevail, nevertheless it is important that Weyerhaeuser not be read too broadly. First, as indicated in Spokane Grain, Weyerhaeuser`s statement that the need to look to two acts to know the law means that the later act is not a complete act is too broad. Further, Weyerhaeuser also too broadly states the test for whether the requirement of art. II, § 37 must be followed is whether the later enactment changes [the] prior act in scope and effect. A later enactment which is a complete act may very well change prior acts and is exempt from the requirement of art. II, § 37.
However, aside from such statements, the new enactment in Weyerhaeuser clearly violated art. II, § 37. The new enactment specifically altered some of the provisions of the SMA (stating that local entities could exercise any authority under the SMA except that in relation to `shorelines' as defined in RCW 90.58.030, the following shall apply [then describing exceptions to that authority,] and providing that with the exceptions stated (in the new FPA), the authority of local government was unchanged, Laws of *804 1975, 1st Ex.Sess., ch. 200, § 11). This is the kind of amendment of an existing statute which art. II, § 37 addresses.
However, the constitutional provision does not apply in all cases where a new act in effect, amends another; where the new law is independent, and no further search is required to know the law which the new act covers, the new act does not come within the constitutional provision. In re Dietrick, 32 Wash. at 479-80, 73 P. 506.
As to Wash. Educ. Ass'n, the court there held that a new enactment which set statewide limitations on public school salaries was unconstitutional because it did not set forth existing statutes which were amended. The new act merely provided that no school district could grant a salary increase greater than a certain amount, but did not specify what powers remained with the district or whether a district had the power to grant raises at all. 93 Wash.2d at 40, 604 P.2d 950. Moreover, a straightforward reading of the existing statutes indicated that the district had the power to expend funds as it chose on teachers' salaries, and the challenged act purported to amend this authority. Id. at 41, 604 P.2d 950. Thus, the measure satisfied neither of the two tests used to determine if art. II, § 37's requirement had to be followed.
Amalgamated Transit also contends that this case is not like Thorne and Manussier. It argues that modification is not apparent from reading I-695's provisions. Amalgamated Transit says that one interested in knowing the law applicable to local referenda, for example, would have no reason to look in the code chapter on state expenditure limitations. Amicus Curiae League of Women Voters of Washington similarly argues that prior to I-695, voters only had to approve real property tax levies which exceeded the prior levy by 106 percent, RCW 84.55.010, but I-695 changed this without amending RCW 84.55. Amicus League of Women Voters says that a voter reading RCW 84.55 would be unaware that I-695 changed this law. Amicus League of Women Voters says that because voters could no longer discern the law from reading statutory provisions regarding limitations on property tax levies, I-695 violates art. II, § 37.
These arguments disclose that the second test for when a new enactment must comply with art. II, § 37 can sometimes be misleading. As noted, that question asks [w]ould a straightforward determination of the scope of rights or duties under the existing statutes be rendered erroneous by the new enactment? Wash. Educ. Ass'n, 93 Wash.2d at 41, 604 P.2d 950 (citing Weyerhaeuser, 91 Wash.2d at 731, 592 P.2d 1108). This question cannot be answered in isolation, because complete acts may well result in a person reading an existing statute and being unaware there is new law on the subject. Thus, it is not enough to ask whether one reading an existing statute would be aware that a new enactment changes it.
Nevertheless, section 2's voter approval requirement violates art. II, § 37. Although numerous arguments are raised, one example shows why. RCW 53.36.100 requires a public vote if, but only if, a port district seeks to extend an industrial improvement district assessment beyond a six-year period. I-695 contains a more general voter approval provision that applies in general to such assessments. I-695 does not repeal or mention the existing statute, but it clearly has impact since it encompasses voter approval for all taxes. However, because both statutes contain voter approval requirements, the impact is not at all clear. At the least, one would not know the law by referring to the existing statute. Nor can it be said that section 2 stands alone on the subject in light of the existing statute's voter approval requirement, which specifically describes how and when a special election is to be held, and what percentage of voters must approve. See RCW 53.36.100. Section 2 of I-695 is therefore not complete. I-695 does not set forth the existing statute which is affected nor does it show how it is impacted.
Section 3 is also a focus of the art. II, § 37 arguments. Initially, there is a general issue regarding repeals. Section 3 of I-695 repealed a number of statutes, and the question is whether repealed statutes must be set forth in the repealing act. The State contends that statutory repeals are outside *805 the scope of art. II, § 37. This court has held that statutes must be set forth in full only when they are revised or amended, and not when they are repealed. State v. Frazier, 81 Wash.2d 628, 632, 503 P.2d 1073 (1972). It is urged, though, that this rule applies only when statutes are repealed by complete acts. See Naccarato, 46 Wash.2d at 75, 278 P.2d 641. The constitutional provision applies where act[s are] revised or amended[.] Art. II, § 37. It is clear by this language that repealers are not within art. II, § 37 whether the new act is complete or not.
Turning to more specific arguments regarding section 3, the Cities argue that section 3 attempts to eliminate funding for many important programs, and therefore it has an enormous impact on existing laws which is not disclosed in violation of art II, § 37. Amicus Curiae of Kincheloe, Schindler, and the Washington Coalition of Citizens with Disabilities (Coalition) make a similar argument. Amicus Coalition contends that section 3's repeal of RCW 82.44.110,.150, and .180 drastically altered the public transportation system, eliminating services for persons with disabilities. These statutes were not, Amicus Coalition argues, related to imposition of taxes, but instead concerned allocation of revenues to public transportation. Amicus Coalition says that the voters could not reasonably know from I-695 that one of its direct effects would be the loss of public transportation. Amici contend that public debate before the election is insufficient notice of the effect of I-695, because that public debate might not reach all member of the public.
It is clear, though, that with repeal of the MVET, funding would be affected. I-695 cannot be said to be incomplete as to the subject of eliminating the MVET. Accordingly, these arguments are unpersuasive.[21]
Amicus League of Women Voters makes another argument respecting sections 1 and 3 of I-695. It says that persons considering I-695 alone would conclude that they would have to pay only a $30 license fee, but in fact some other fees would have to be paid. Amicus League of Women Voters says that I-695 neither repealed these fees nor disclosed them to the voters, and that voters must refer to more than I-695 to know the law respecting license tab fees. For this reason, Amicus League of Women Voters says, I-695 is unconstitutional. However, this argument fails to appreciate that by the terms of the constitutional provision itself, acts revised or section[s] amended must be set forth. Art. II, § 37. The fees identified by Amicus League of Women Voters are not affected by I-695.
The Tacoma Water respondents say that section 3 does not disclose that I-695 revised or changed provisions in Titles 35 RCW and 57 RCW which set forth their right and duty to set and collect water rates and charges. They maintain that this failure means that I-695 does not allow the average informed voter to make an informed conclusion as to which tax, fee, and charge statutes were being changed to include a voter approval requirement. The Cities similarly state that I-695 would render superfluous virtually every statute which gives cities revenue-generating authority, and voters would have no way to tell which statutes are affected. These arguments are unpersuasive, because I-695 discloses that all increased taxes are subject to voter approval.
The Cities also argue that aside from the statutes which I-695 states are repealed, the initiative effectively strips cities of their statutory authority to raise revenues, thus making a fundamental change in the authority of municipal governments. The inability to tax without voter approval is disclosed by I-695, however.
We hold that section 3 does not violate art. II, § 37.
*806 Finally, the State urges that if the court holds that I-695 violates art. II, § 37, the remedy is not invalidation of I-695, but rather a declaration that the other law continues in force. We disagree. Invalidation of the unconstitutional enactment is the proper remedy. See, e.g., Rourke v. Dep't of Labor & Indus., 41 Wash.2d 310, 314, 249 P.2d 236 (1952); Weyerhaeuser, 91 Wash.2d at 733, 592 P.2d 1108; Wash. Educ. Ass'n, 93 Wash.2d at 41, 604 P.2d 950.
Here, as to the subject matter of section 2, voter approval, I-695 is not complete, and it fails to disclose its effect on an existing voter approval statute. This, in and of itself, constitutes a violation of art. II, § 37, and section 2 is accordingly invalid.
Finally, in light of our decision, the appellants' motions for a stay of the trial court's order enjoining implementation and enforcement of section 2 of I-695 are moot.

Conclusion
I-695 violates several state constitutional provisions. It contains two subjects in violation of art. II, § 19, thus placing citizens in the position of being asked to decide two unrelated laws with only one vote. I-695 also violates art. II, § 19 because the subject of voter approval of tax increases is not adequately set forth in the title of the initiative; the title fails to disclose that the term tax does not have its common meaning in the body of the initiative. The disparity between the title and the text fails to notify voters of the breadth of the law's reach. Section 2 of I-695 also violates art. II, § 1(b) because it establishes a referendum procedure which does not comport with the four percent signature requirement of constitutional provision. This fundamental shift in legislative authority requires a constitutional amendment which cannot be accomplished by initiative. Finally, section 2 of I-695 violates art. II, § 37 because it fails to set forth an existing law that is amended or revised by I-695, thus causing confusion, ambiguity and conflict in respect to existing law.
The trial court's judgment declaring I-695 unconstitutional in its entirety is affirmed.
GUY, C.J., SMITH, TALMADGE, IRELAND, and BRIDGE, JJ., concur.
ALEXANDER, J. (concurring).
It is readily apparent that initiative measure 695 (I-695) is a "bill" that embraces more than one subject. Thus, I entirely agree with the majority's conclusion that it runs afoul of the single-subject provision in article II, section 19, of the Washington Constitution.
Having reached that determination, we should go no further. The majority does not, however, stop with its analysis of I 695's collision with article II, section 19, but rather goes on to hold that the measure violates another provision of article II, section 19, as well as article II, sections 1(a) and (b), and article II, section 37. It is, in my view, unnecessary for the court to make these additional conclusions. I say that because when a bill embraces more than one subject, whether it is passed by the Legislature or the people, it violates the state constitution and must be struck down.
The majority's buttressing of its opinion with holdings that I-695 violates additional provisions of the state constitution could lead a reader of the opinion to conclude that the violation of the single-subject provision of the constitution makes I-695 only slightly unconstitutional. That, of course, is not the case. Since we are the last word on the meaning of the state constitution, we should resist the temptation to hold that I-695 is unconstitutional on other grounds.
JOHNSON, J., concurring.
SANDERS, J. (dissenting).
We must avoid
the erroneous and all-too-common assumption that the Constitution means what we think it ought to mean. It does not; it means what it says.[[1]]
The principal questions to be answered in this appeal are threefold: (1) whether Initiative *807 Measure 695 (I-695) violates article II, section 19, of the Washington Constitution ("No bill shall embrace more than one subject, and that shall be expressed in the title"); (2) whether the provision of the initiative which subjects future taxing measures to a vote of the people unconstitutionally apes article II, section 1's referendum clause; and (3) whether the same section is itself facially invalid because it allegedly fails to set forth the full text of various statutes amended, contrary to article II, section 37.
The appropriate standard for appellate review is de novo consideration of all legal questions.[2] This requires the challenged enactment to be measured strictly against the constitutional standard set by the plain meaning of the constitutional text at issue. Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997) ("Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well."). The de novo standard subjects the initiative to stricter constitutional scrutiny than does the majority's alleged presumption of constitutionality unless proved otherwise "beyond a reasonable doubt" test.[3] Majority at 780. However, for the reasons which follow, I conclude this initiative passes constitutional muster under even the higher standard.

I

Washington Constitution, article II, section 19
Bill to contain one subject. No bill shall embrace more than one subject and that shall be expressed in the title.
The question posed by article II, section 19, is threefold: (1) is this initiative a "bill"; if so, (2) does it embrace more than one subject, or (3) is that subject adequately expressed in the title?
A. Is an initiative to the people a "bill"?
Citing Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 551-53, 901 P.2d 1028 (1995), and Fritz v. Gorton, 83 Wash.2d 275, 328-42, 315-16, 517 P.2d 911 (1974), without further analysis, the majority asserts initiatives are subject to this constitutional provision. Majority at 781. Unfortunately none of the parties has briefed whether an initiative to the people is a "bill," making this an ideal case for the application of RAP 10.1(h), which vests in the appellate court authority to request additional briefing on an issue not adequately presented.
While the present posture of this case unfortunately does not allow the court to cross the threshold of any challenge mounted under this section, I offer the following observations to merit the court's careful consideration, best informed by further briefing and argument.
Unlike the initiative provision which was first added by amendment 7 to the Washington Constitution in 1912, article II, section 19, resided in the original text of the Washington Constitution as ratified in 1889. According to dictionaries of the time "bill" meant the "draft or form of an act presented to the legislature but not enacted." Anderson Dictionary of Law 120 (1889) (emphasis added). This popular definition obviously excluded initiatives presented directly to the people for enactment. Additionally, because amendment 7 was not ratified by the people until 1912, use of the term "bill" in 1889 could not possibly have specifically referenced initiatives measures which did not then even exist.
The textual context surrounding article II, section 19, likewise rules out the claim that initiatives to the people are "bills." Article II, section 22, entitled "Passage of Bills," provides:

*808 No bill shall become a law unless on its final passage the vote be taken by yeas and nays, the names of the members voting for and against the same be entered on the journal of each house, and a majority of the members elected to each house be recorded thereon as voting in its favor.
Const. art. II, § 22 (emphasis added). Article II, section 1, initiatives to the people are absolutely and facially incompatible with this constitutional requisite for "bill" adoption because initiatives to the people do not go through the legislative process, much less are they subject to a legislative vote of yeas and nays entered on the journal of each house.
Amendment 7 also provides in relevant part: "[B]ut the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls...." Const. art. II, § 1 (emphasis added). Applying the familiar maxim that each word in a constitutional provision must be accorded its own separate meaning, and the court should not embrace a construction causing redundancy or rendering words superfluous, City of Bellevue v. Lorang, 140 Wash.2d 19, 25, 992 P.2d 496 (2000), it follows "bills" must mean something other than "laws," and the use of both terms signifies the initiative process was somehow designed to embrace both.
That an initiative may arguably be a bill or a law, but not both, is demonstrated by article II, section 1(a), which establishes two categories of initiative: one to the legislature and one to the people. The first allows initiatives, at the option of their sponsors, to be submitted to the legislature wherein they "shall take precedence over all other measures in the legislature except appropriation bills and shall be either enacted or rejected without change or amendment by the legislature before the end of such regular session." Const. art. II, § 1(a) (emphasis added). The same provision provides if the initiative is enacted by the legislature it shall be subject to a referendum petition or, if it is rejected by the legislature, it must be referred to the people at the next regular election.
The second procedure contemplates initiative measures may be alternatively submitted directly to the people without prior submittal to the legislature at all. That was the procedure utilized here.
I would therefore posit a consistent reading of these provisions, giving effect to the plain meaning of each word, may characterize initiatives to the legislature "bills," as all other bills in the legislative process (except with priority); whereas initiatives directly to the people at a general election are not "bills" but "laws," laws which are necessarily outside the scope of article II, section 19, because they are not "bills."
This analysis is consistent with our holding in Senior Citizens League v. Dep't of Soc. Sec., 38 Wash.2d 142, 173, 228 P.2d 478 (1951). There we considered the constitutionality of Initiative Measure 178 vis-à-vis an article II, section 19, challenge based upon the initiative's alleged failure to include a sufficiently descriptive ballot title. We held article II, section 19, did not apply to initiative ballot titles, because initiatives are not "bills":
The legislative title is mere surplusage, since the constitutional provision quoted above applies only to "bills." A bill is a "form or draft of a law presented to the legislature for enactment." Webster's New International Dictionary. The term refers to proposed laws pending in the legislature. In re Hulet, 159 Wash. 98, 292 Pac. 430 [(1930)]; Hubbard v. Lowe, 226 Fed. 135 [(S.D.N.Y.1915)]; May v. Rice, 91 Ind. 546 [(1883)]; State v. Hegeman, 2 Pennewill (Del.), 147, 44 Atl. 621 [(1899)].... No act passed by the people of this state has ever been declared unconstitutional because of a defective legislative title.
Senior Citizens League, 38 Wash.2d at 173, 228 P.2d 478.
The Senior Citizens League case has never been overruled although two subsequent cases, in dicta, express a majority view that initiatives are in fact "bills." See Fritz, 83 Wash.2d 275, 517 P.2d 911 and Wash. Fed'n of State Employees, 127 Wash.2d 544, 901 P.2d 1028. In neither case, however, was the answer to this question necessary, dispositive, or central to the holding of the case. Therefore language to that effect in both *809 cases was mere dicta and, accordingly, not of precedential value.[4]
Today's majority cites Fritz to support its assertion that an initiative is subject to article II, section 19, only by cobbling together votes of dissenting and concurring justices on a nondispositive issue. Majority at 781. By the same token Washington Federation of State Employees, also authored by Justice Madsen, principally relies upon Fritz as well as that court's subjective view about appropriate "policies underlying the provision," rather than the actual text. Wash. Fed'n of State Employees, 127 Wash.2d at 552, 901 P.2d 1028.
Washington Federation also claims "Senior Citizens was, in fact, overruled on this issue by Fritz," id. at 553, 901 P.2d 1028, a truly startling claim, itself asserted in dicta, woven from dicta and dissent.
However even if the majority were correct, and there is precedential support for its view, the constitutional text must surmount our mistakes[5] if, after all, "it is a constitution we are expounding." M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819) Stare decisis
is not an inexorable command; rather it "is a principle of policy and not a mechanical formula of adherence to the latest decision." Helvering v. Hallock, 309 U.S. 106, 119[, 60 S.Ct. 444, 84 L.Ed. 604] (1940). This is particularly true in constitutional cases, because in such cases "correction through legislative action is practically impossible." Burnet v. Coronado Oil & Gas Co., [285 U.S. 393,] 407[, 52 S.Ct. 443, 76 L.Ed. 815 (1932) ] (Brandeis, J., dissenting).
Payne v. Tennessee, 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
For these reasons I would not entertain a serious challenge to the constitutionality of this initiative under the provisions of article II, section 19, absent a thorough and serious discussion of whether this constitutional provision has any application to initiatives in the first place.
B. Does I-695 encompass more than one subject contrary to article II, section 19?
Assuming article II, section 19, applies to initiatives, the question then arises whether this initiative unconstitutionally encompasses more than a single subject.[6]
The challengers contend it does, asserting the provisions of I-695, section 1, limiting license fees to $30 per year is necessarily a different subject than section 2 wherein tax increases are limited absent a vote of the people.
However the proponents of the initiative claim that these sections are rationally unified means to accomplish but a single end, the limitation of taxing authority. They argue both components of the initiative are a rationally unified approach to address the problem set forth in the voters pamphlet: "Once vehicle tabs were lowered to $30, we knew politicians would try to raise other taxes." CP at 641 (State of Wash. Voters Pamphlet, General Election 4 (Nov. 2, 1999, ed. 2) (Voters Pamphlet)).[7]
*810 Quixotically, the trial court admitted a "rational link" between reduction of license tab fees and the erection of barriers to replacement taxes, but opined a "rational link" is short of the "rational unity" required to withstand constitutional challenge under the single subject rule. Clerk's Papers (CP) at 839.
Although case law references "rational unity," State ex rel. Wash. Toll Bridge Auth. v. Yelle, 61 Wash.2d 28, 33, 377 P.2d 466 (1962), itself an extraconstitutional term, no authority supports the trial court's asserted distinction between "rational link" and "rational unity." This distinction without a difference appears to have been simply fabricated by the trial court out of whole cloth .[8] Notwithstanding, were we to determine this case upon the asserted semantic difference, I would side with the proponents of the initiative since that which is rationally linked must necessarily be rationally unified, in the same sense that separate links, when joined together, are unified in a single chain.
The majority acknowledges the constitutional single subject rule is not violated by a general subject which contains several incidental subjects or subdivisions. Majority at 781. Furthermore, this court "has never favored a narrow construction of the term `subject' as used in Const. art. 2, § 19." State v. Waggoner, 80 Wash.2d 7, 9, 490 P.2d 1308 (1971).
We explored the limits of incidental subjects or subdivisions in Fritz, holding the six individual components of Initiative 276 were unified by the "generic subject" of "openness in government," notwithstanding these unifying words appeared nowhere in the initiative's title. Fritz, 83 Wash.2d at 290, 517 P.2d 911.
Explaining the requirement of rational unity, this court said:
"[T]here must be some rational unity between the matters embraced in the act, the unity being found in the general purpose of the act and the practical problems of efficient administration.... For purposes of legislation, `subjects' are not absolute existences to be discovered by some sort of a priori reasoning, but are the result of classification for convenience of treatment and for greater effectiveness in attaining the general purpose of the particular legislative act."

State ex rel. Wash. Toll Bridge Auth., 61 Wash.2d at 33, 377 P.2d 466 (quoting State ex rel. Test v. Steinwedel, 203 Ind. 457, 467, 180 N.E. 865, 868 (1932) (first and last emphases added)).
The electorate had every right and constitutional authority to adopt an initiative to impede taxing authority. I-695 generally limits taxing authority by not only reducing license fee tabs to $30 but also requiring voter approval of all future state and local tax increases. When the majority asserts "neither subject is necessary to implement the other," Majority at 786, it assumes its answer by posing the question in terms of a double purpose, rather than a single object served by complementary means, each of which is necessary to limit the overall tax burden. The true question is therefore whether the voters' effort to limit taxation through the multiple means of not only reducing license tab fees but also erecting a barrier to new replacement taxation constitutes two subjects, or two means to implement a single subject.
The majority refuses to recognize the simple truth that the motor vehicle excise tax (MVET) limitation would have been rendered functionally meaningless had big-spending state and local legislatures been unrestrained from simply increasing other taxes to offset lower initiative-mandated taxation.[9] The majority says "neither subject is necessary to implement the other," Majority at 786, but this cannot be correct if the single "subject" is tax limitation in general rather than simply reducing a single tax without relation to reduction *811 or at least procedural limitation of potential replacement taxes as well.
I submit this initiative presents a rationally unified approach to deal with both aspects of the same problem: reducing a tax as well as limiting the prospect that it will be replaced.
The unified tax limitation subject stands in contradistinction to the majority's examples of multiple and dissimilar subject enactments, such as joining criminal penalties for dognapping with attorney fees in civil replevin actions (Barde v. State, 90 Wash.2d 470, 584 P.2d 390 (1978)) or joining civil rights legislation with regulation of cemeteries (Price v. Evergreen Cemetery Co., 57 Wash.2d 352, 357 P.2d 702 (1960)). Majority at 783. Those subjects bear no rational connection with one another whereas this topic is generically linked.
The majority claims the single subject issue is controlled by Wash. Toll Bridge Auth. v. State, 49 Wash.2d 520, 304 P.2d 676 (1956), asserting a distinction between objects of an initiative which are general versus specific, as well as objects subject to immediate accomplishment in contrast to those which continue. Majority at 785, 786.
However, the majority's own explanation of the rational unity analysis admits of no such distinctions. See Majority at 782. The "`practical problems of efficient administration' " and the right to classify incidental subjects or subdivisions "`for convenience of treatment and for greater effectiveness in attaining the general purpose of the particular legislative act,'" are both cited, but ignored, as the basis to recognize legitimate multiple subdivisions within an initiative. Majority at 782 (quoting State ex rel. Wash. Toll Bridge Auth., 61 Wash.2d at 33, 377 P.2d 466). Rather than distinguishing between general and specific, continuing or final, the rational unity analysis invites their inclusion as necessarily related to the efficient administration and accomplishment of an overall objective.
The single subject of this initiative is restraint in taxation. It is simply a democratic effort to control the taxation pegboard whereby seemingly every time one tax is limited or eliminated another springs forth or swells to take its place. It embraces but a single subject addressed through complementary measures. It therefore complies with the letter of article II, section 19's single subject rule.
C. Is the title of I-695 sufficient under article II, section 19?
The Attorney General expressed the subject of I-695 by asking, "Shall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed?" CP at 641 (Voters Pamphlet at 4). This title provides as comprehensive and complete a description of the initiative's subject as 25 words will permit,[10] leaving the majority to quibble about the meaning of "tax." Majority at 791. However the majority provides succinct refutation to its own argument that the title is insufficient as "tax" is defined within the body of the initiative:
The meaning of the term "tax" is to be determined according to the intent of the voters. Wash. State Dep't of Revenue [v. Hoppe], [82 Wash.2d 549,] at 552[, 512 P.2d 1094 (1973)]. If this intent can be determined from the language of the initiative, the court's inquiry ends there. Senate Republican Campaign Comm. [v. Pub. Disclosure Comm'n, 133 Wash.2d 229,] at 242[, 943 P.2d 1358 (1997)].
Majority at 786-787.
The title of an initiative "`need not be an index to its contents; nor is the title expected to give the details contained in the bill.'" Wash. Fed'n of State Employees, 127 Wash.2d at 555, 901 P.2d 1028 (quoting Treffry v. Taylor, 67 Wash.2d 487, 491, 408 P.2d 269 (1965)). The contents of an initiative can constitutionally entail "any subject reasonably germane" to its title. DeCano v. State, 7 Wash.2d 613, 627, 110 P.2d 627 (1941).
A ballot title need not include a unifying "umbrella" term but, rather, "`[i]f the subject of the act can be reasonably gathered *812 from reading the title as a whole, the subject is sufficiently expressed therein.'" Fritz, 83 Wash.2d at 291, 517 P.2d 911 (quoting Maxwell v. Lancaster, 81 Wash. 602, 607, 143 P. 157 (1914)). In Fritz, the words "openness in government" did not appear within the 100-word ballot title,[11] but was determined to be the (single) subject of the act. 83 Wash.2d at 290, 517 P.2d 911.
Moreover, when the words of a title may be given two interpretations, only one of which renders the act constitutional, that is the interpretation which must be adopted by the court. Wash. Fed'n of State Employees, 127 Wash.2d at 556, 901 P.2d 1028 (quoting Treffry, 67 Wash.2d at 491, 408 P.2d 269). Objections to the title "must be grave and must present a palpable conflict between the title and the constitution before the act will be held unconstitutional." Shea v. Olson, 185 Wash. 143, 152, 53 P.2d 615 (1936). Differing meanings attributed to the term "tax" are neither "grave" nor do they rise to the level of "a palpable conflict between the title and the constitution."
Most fundamentally an initiative title is constitutionally sufficient "`if it gives notice that would lead to an inquiry into the body of the act, ....'" Wash. Fed'n of State Employees, 127 Wash.2d at 555, 901 P.2d 1028 (emphasis added) (quoting YMCA v. State, 62 Wash.2d 504, 506, 383 P.2d 497 (1963)). The majority presumes the voting public could not possibly have comprehended the full universe of charges encompassed by the word "tax," Majority at 791, yet the question is not that, but rather whether use of the term at least put the public on notice that would lead to further inquiry. As the majority says, if the term is defined in the act "the court's inquiry ends there." Majority at 786-787. Moreover since statements in the official voters pamphlet "may be considered to ascertain the collective purpose and intent of the people," Thorne, 129 Wash.2d at 763, 921 P.2d 514, the majority admits more than (what the majority characterizes as) "traditional taxes were contemplated ." Majority at 790.
Here the majority finds fault with a title one-fourth as long and which, unlike Fritz, contains a commonly used and understood umbrella term further defined in the body of the initiative. The "common meaning" of "tax" encompasses "any contribution imposed by government upon individuals, for the use and service of the state, whether under the name of a toll, tribute, tallage, gabel, impost, duty, custom, excise, subsidy, aid, supply, or other name." Black's Law Dictionary 1457 (6th ed.1990). While the majority claims the initiative's definition of tax is broader than the "common meaning," it fails to authoritatively establish its own narrow view as the true and only "common meaning," much less indicate which effects of I-695 fall outside that "common meaning." Majority at 790-791. In truth the majority is not applying the "common meaning" but a very technical, narrow, and often disputed one.
Nor does the majority enlighten us as to an alternate word which would more suitably inform the voter of the initiative's object. To require the entire definition of the term "tax" be spelled out within the 25 word title in order to provide adequate notice, an impossible and unnecessary task, is a far cry from the constitutional requirement that a general title consist of "a few well-chosen words, suggesting the general subject stated...." In re Boot, 130 Wash.2d 553, 566, 925 P.2d 964 (1996). The statutory limit of 25 words in the ballot title does not permit the majority to indulge its passion for precision if the people are to be allowed to exercise their constitutional initiative power. That is the reason a liberal construction of the title is legally required to the end that its constitutionality be upheld. DeCano, 7 Wash.2d at 627, 110 P.2d 627.
The majority's certainty as to the "common, traditional meaning" of tax to the average voter is also surprising in light of the overwhelming number of different definitions supplied by the various litigants in this very proceeding, Majority at 790-791, not to mention the seemingly endless litigation spawned by the term, and the internal divisions within *813 this very court on its technical meaning. If anything, a review of relevant authorities suggests a lack of consensus on the precise meaning rather than a "common meaning" so clearly limited by well-defined boundaries to render use of the term in a ballot title a fatal constitutional defect. See, e.g., Harbour Vill. Apartments v. City of Mukilteo, 139 Wash.2d 604, 609, 989 P.2d 542 (1999); Covell v. City of Seattle, 127 Wash.2d 874, 905 P.2d 324 (1995); Trimen Dev. Co. v. King County, 124 Wash.2d 261, 270, 877 P.2d 187 (1994); King County Fire Prot. Dists. Nos. 16, 36 & 40 v. Hous. Auth., 123 Wash.2d 819, 833, 872 P.2d 516 (1994); Margola Assocs. v. City of Seattle, 121 Wash.2d 625, 634, 854 P.2d 23 (1993); San Telmo Assocs. v. City of Seattle, 108 Wash.2d 20, 24, 735 P.2d 673 (1987); Teter v. Clark County, 104 Wash.2d 227, 238, 704 P.2d 1171 (1985); Hillis Homes, Inc. v. Snohomish County, 97 Wash.2d 804, 808, 650 P.2d 193 (1982), superseded by statute on other grounds by R/L Assocs., Inc. v. City of Seattle, 113 Wash.2d 402, 780 P.2d 838 (1989). How would the "man on the street" apply the "common meaning" of the term "tax" to an "impact fee" (considered a tax in Hillis), a vacant land charge (to be decided in Samis Land Co. v. City of Soap Lake, No. 68520-7 (Wash.Sup.Ct., argued June 27, 2000)), a storm water fee (not a tax as per Teter ), a road charge (considered a tax in Covell), a license fee for apartments (considered a tax in Harbour Village)?[12]
This is not an initiative where the drafters intentionally used a general term with mass appeal only to narrow it beyond recognition within the body of the initiative. To the contrary, the Attorney General used the most general term availabletaxand the proponents of I-695 specifically set forth the intended application of the term in the definition contained in the body of the initiative. We need not presume our fellow citizens are too stupid to exercise the power the constitution has reserved for them nor so lazy they will judge the details of every initiative solely by its title.
At minimum, use of the term "tax" directs the inquiring mind to the body of the initiative to see precisely what is meant. That is all the constitution requires. Wash. Fed'n of State Employees, 127 Wash.2d at 555, 901 P.2d 1028. The "inquiry" ends there. Majority at 786-787. The subject of this initiative is expressed in its title.

II.
Does the initiative's voter approval requirement unconstitutionally ape article II, section 1's referendum requirement?
The majority begs the question by asking whether the initiative's section 2 voter approval requirement apes the procedure set forth for referenda contained in article II, section 1, of our constitution.
The real question is not that but whether the voter approval requirement exceeds the authority of the legislature, even absent the constitutional right to referendum (later engrafted on our constitution by amendment 7). Unlike today's majority, at oral argument even the opponents of the initiative admitted conditioning tax increases on a vote of the people is within the legislature's inherent power. Amalgamated Transit Union Local 587 v. State, No. 69433-8 (argued June 29, 2000), oral argument tape 1, side 2.
I posit it cannot be seriously argued, nor does the majority argue, the constitution's referendum provision limits the inherent power of the legislature. In other words, if the legislature could have enacted a similar bill prior to the ratification of the referendum amendment in 1912, then there is nothing to prevent the legislature, or the people who are vested with the full scope of legislative power in the initiative power,[13] from enacting *814 such a law in the present day. Therefore it is no answer for the majority to assert the people did not retain the "inherent authority to approve state legislation," Majority at 796 (emphasis added), if the legislature was vested by the people with the power to condition future legislation on a vote of the people. To prevail in its argument the majority must not only demonstrate such power is not "inherent" in the people but likewise is not "inherent" in the legislature. This is a difficult task since the majority admits "nothing in the constitution expressly restricts legislative power to condition state measures on voter approval," Majority at 796, and the court has previously instructed through Justice Madsen:
The state constitution is not a grant but rather is a restriction on the law-making power. Clark v. Dwyer, 56 Wash.2d 425, 431, 353 P.2d 941 (1960). "[T]he power of the legislature to enact all reasonable laws is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitutions." Id. The power to enact contingent legislation has clearly been recognized. The question is whether any limitation on this power exists because the legislation is referred to the people.
Brower v. State, 137 Wash.2d 44, 55, 969 P.2d 42 (1998). Not only does the constitution's referendum provision expressly permit the legislature to refer a matter to the people as a referendum, such as construction of a football stadium, id., but there is nothing within the constitution which limits the legislature's inherent power to do just that even absent a referendum clause.
I-695 does not on its face purport to establish or call for future referenda per se but rather requires any new tax or tax increase be conditioned on voter approval. The majority acknowledges the legislative prerogative to condition specific types of taxes upon general voter approval, as well as the exercise of local option laws requiring localized approval of general proposals, Majority at 799, yet claims while the legislature may condition a single proposal on popular approval, it may not direct that multiple proposals of like kind be so conditioned. Majority at 799-800. This claim is not, however, supported by any citation of authority, nor is it consistent with long-standing constitutional theory which looks to the constitution, not the individual preferences of those on the court, to divine the limits of legislative authority.
The majority asserts:
[W]e conclude that prior to the people's adoption of the initiative and referendum powers in this state, the Legislature lacked the authority to condition measures on a vote of the people.
Majority at 798. I submit that this statement is precisely the sort of errant claim to which Justice Scalia referred when he said it is an "erroneous and all-too-common assumption that the Constitution means what we think it ought to mean. It does not; it means what it says." Apprendi, 530 U.S. at ___, 120 S.Ct. at 2367 (Scalia, J., concurring). Our constitution says nothing of the kind. The majority simply invents a limitation on legislative authority not set forth in the constitution, claiming to hold otherwise "would be inconsistent with the representative form of government in this state." Majority at 798-799. But what is a representative form of government if our representatives are "inherently" denied the prerogative to legislate as they see fit absent constitutional limitation? By denying the inherent power of the legislature to condition taxing measures on popular approval, the majority does not promote representative government, it cripples it.
Chief Justice Cooley of the Michigan Supreme Court, renowned constitutional scholar and treatise author relied upon at least 170 times by this court,[14] recognized the inherent *815 authority of state legislatures to condition measures on popular approval:
If it is not constitutional to delegate to a single locality the power to decide whether it will be governed by a particular charter, must it not quite as clearly be within the power of the legislature to refer to the people at large, from whom all power is derived, the decision upon any proposed statute affecting the whole State? And can that be called a delegation of power which consists only in the agent or trustee referring back to the principal the final decision in a case where the principal is the party concerned, and where perhaps there are questions of policy and propriety involved which no authority can decide so satisfactorily and so conclusively as the principal to whom they are referred?
Thomas M. Cooley, A Treatise on the Constitutional Limitations 142-43 (5th ed. 1883).
Similarly the New Jersey Supreme Court considered a jury selection law conditioned on statewide voter approval, finding "[t]he question was not sent to the voters to initiate or formulate any law upon the subject. Their will was simply made the contingency or condition upon which the statute should or should not become operative. They did not `legislate' upon the subject." Hudspeth v. Swayze, 85 N.J.L. 592, 89 A. 780, 786 (1914).
And in Smith v. City of Janesville, 26 Wis. 291, 292 (1870), the Wisconsin Supreme Court held that there was no difference in principle between conditioning local and general laws upon voter approval, the result of an election being a future contingent event upon which a general law could be properly conditioned. Comparing a statewide tax law to the local option considered in State ex rel. Attorney General v. O'Neill, 24 Wis. 149 (1869), the court observed:
We came unanimously to the conclusion in that case, that a provision for a vote of the electors of the city of Milwaukee in favor of an act of the legislature, before it should take effect, was a lawful contingency, and that the act was valid. That was a law affecting the people of Milwaukee particularly, while this was one affecting the people of the whole state. There the law was submitted to the voters of that city, and here it was submitted to those of the state at large. What is the difference between the two cases? It is manifest, on principle, that there cannot be any. The whole reasoning of that case goes to show that this act must be valid; and so it has been held in the best considered cases, as will be seen by reference to that opinion.
Smith, 26 Wis. at 295.
No less than Justice Oliver Wendell Holmes while serving on the Massachusetts Supreme Judicial Court considered the identical question "whether an act of the legislature is made unconstitutional by a proviso that, if rejected by the people, it shall not go into effect." In re Municipal Suffrage to Women, 160 Mass. 586, 36 N.E. 488, 491 (1894) (Holmes, J., dissenting). Holmes agreed the discretion of the legislature is intended to be exercised, and that confidence is put in it as an agent, but thought "so much confidence is put in it that it is allowed to exercise its discretion by taking the opinion of its principal, if it thinks that course to be wise." Id. at 492 (emphasis added).
I have no hesitation accepting the reason and authority of Justices Cooley and Holmes and our sister states on the point in controversy. The people can exercise the same power as the legislature unless the constitution prohibits itit doesn't.
The majority then muses neither the legislature nor the people have the power to condition a state law solely on voter approval because it would "transfer[ ] the determination of expediency of the measure to the voters." Majority at 798. But the rule is well established that a statute does not delegate legislative power simply because it leaves to a contingency whether or when it shall take effect. See State v. Tausick, 64 Wash. 69, 79, 116 P. 651 (1911).
In Diversified Inv. P'ship v. Dep't of Soc. & Health Servs., 113 Wash.2d 19, 27, 775 P.2d 947 (1989), we affirmed the mere fact an act does not take effect until a contingency arises does not a delegation of legislative power make, even where the contingency depends upon the action of certain persons. This is so because *816 "The event or change of circumstances on which a law may be made to take effect must be such as, in the judgment of the legislature, affects the question of the expediency of the law; an event on which the expediency of the law in the opinion of the law-makers depends. On this question of expediency the legislature must exercise its own judgment definitely and finally. When a law is made to take effect upon the happening of such an event, the legislature in effect declare the law inexpedient if the event should not happen, but expedient if it should happen. They appeal to no other [persons] to judge for them in relation to its present or future expediency. They exercise that power themselves, and then perform the duty which the Constitution imposes upon them."
Id. (quoting Thomas M. Cooley, A Treatise on the Constitutional Limitations 169 (7th ed.1903)).
Here the voters, in their legislative capacity, determined the expediency of future tax measures must be contingent upon the outcome of voter approval. Voter approval of the measures would not, itself, be further legislation, but merely the contingency upon which the effect of such measures would depend.
Ultimately, if I-695 does "transfer[ ] the determination of expediency" to the voters as the majority contends, what provision of the constitution says it can't? The initiative is a complete legislative mandate which declares future tax increases "`inexpedient if [approval] should not happen, but expedient if it should happen.'" Diversified Inv. P'ship, 113 Wash.2d at 27, 775 P.2d 947 (quoting T. Cooley, supra, at 169). That the people may exercise their authority to condition future tax burdens on democratic approval is no constitutional ground to defeat it, as nothing in the text of our constitution provides such a ground. Only the majority does that.

III.
Does the initiative violate article II, section 37's requirement that "[n]o act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length"?
The language of article II, section 37, plainly pertains to the effect on prior enactments, not the validity of the current one. If the prior act revised or amended is referenced only by title, not set forth in full, it cannot be revised or amended by the current enactment unless the subsequent enactment is complete unto itself. Const. art. II, § 37. However a challenge under this provision has nothing to do with the constitutionality of the current enactment, rather only its effect on specific prior ones.
The majority subverts the plain language of article II, section 37, by rewriting the constitutional provision to apply not to "the act revised or the section amended" but to the act which does the revision. Accordingly rather than using this constitutional provision as a foil for each individual statute affected, it perverts it to render a section of I-695 facially invalid in its entirety, without regard to specific conflict with prior statutes in its application. Nowhere in the language of article II, section 37, do we find such sweeping power. The majority bestows it upon itself. Majority at 804.
What if the most recent enactment is ineffectual to amend one prior statute but is broader in scope than that statute? Is it therefore invalid where there is no conflict? What if the prior statute which was ineffectively amended is later repealedis the initiative still "facially invalid?" The majority's claim of facial invalidity is most problematic, as, at most, a statute may be ineffective to amend a preexisting statute; whereas "[a] statute held invalid as applied is not void on its face or incapable of valid application in other circumstances." Found. for the Handicapped v. Dep't of Soc. & Health Servs., 97 Wash.2d 691, 695, 648 P.2d 884 (1982); see also Shell Oil v. State, 113 Wash. 632, 640-41, 194 P. 835 (1921) (statute unconstitutional as applied to companies engaged in interstate commerce, but not as to companies engaged in intrastate commerce).
I therefore take strong exception to the majority's facially unfounded conclusion that "section 2's voter approval requirement violates art. II, section 37." Majority at 804.
*817 This cannot possibly be the case. Rather the most that could conceivably be said is that purported initiative amendments to one or more specific statutes are ineffectual, not that the section of the initiative is swept away as to every other specific application, much less in its entirety.
Even where a statute is amended or modified without setting forth its entire text, article II, section 37, is not violated where: (1) the new enactment is "such a complete act that the scope of the rights or duties created or affected by the legislation action can be determined without referring to any other statute or enactment," Wash. Educ. Ass'n v. State, 93 Wash.2d 37, 40, 604 P.2d 950 (1980); and (2) a "straightforward determination of the scope of rights or duties under the existing statutes [would not] be rendered erroneous by the new enactment." Id. at 41, 604 P.2d 950 (citations omitted). See also State v. Thorne, 129 Wash.2d 736, 756, 921 P.2d 514 (1996) and State ex rel. Living Servs., Inc. v. Thompson, 95 Wash.2d 753, 757, 630 P.2d 925 (1981).
In any case, and at the least, the language of article II, section 37, requires an individualized assessment of the effect of an allegedly amending statute on the amended or revised statute at issue.
In Walker v. Munro, 124 Wash.2d 402, 879 P.2d 920 (1994), we considered a similar challenge to Initiative 601, which set limits on all future enactments relating to spending, taxation, and fees. We decided the petitioner's article II, section 37, claim was not justiciable because the petition merely cited hundreds of fee statutes, making a generalized assertion that all of these statutes were amended by the legislative approval provision. Walker, 124 Wash.2d at 420, 879 P.2d 920. We noted that petitioners made no argument as to "whether each one has, in fact, been amended," holding: "We certainly will not, on our own, analyze each and every statute referred to by the Petitioners to determine whether section 8 has improperly amended the statute. That task is for the Petitioners to undertake." Id.
The reasoning of Walker correctly reflects the individualized analysis of the prior acts required under article II, section 37, and demonstrates a considerably more restrained, and proper, application of the constitutional provision to the allegedly amended statutesnot the current enactment. To follow today's majority approach, however, we would need only identify one statute ineffectively amended to find the initiative facially invalid in its totality, now, and forever more.
The majority does cite one statute it claims may have been amended by I-695. Majority at 804. The initiative may thus be rendered ineffective with regard to RCW 53.36.100, to the extent I-695 was not a complete act and demonstrably amended the specific statute. However even if so, that would not facially invalidate I-695 or any portion thereof.
Further, the majority does not give effect to the severability clause contained in I-695, as would be required if it truly is unconstitutional in some respect or application. See Gerberding v. Munro, 134 Wash.2d 188, 196, 949 P.2d 1366 (1998).
If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected.
Laws of 2000, ch. 1, § 5 (text of I-695, § 5).
If one statute is ineffectively amended by the initiative because of a conflict with the constitution, the severability clause requires us to uphold the validity of the remainder of the initiative, or all other constitutional applications. Id.[15]

*818 IV.

Conclusion
I therefore conclude I-695 does not conflict with the text of the preceding constitutional provisions. The people have expressed their will that their tax burden be limited. The constitution does not stand in their way and neither should this court.
I dissent.
NOTES
[1] The legislative title of the measure is AN ACT [r]elating to limiting taxation by: limiting excessive license tab fees; limiting tax increases by requiring voter approval; repealing existing licensing fees ...; repealing existing excise taxes.... Laws of 2000, ch. 1.
[2] Amalgamated Transit Union Local 587 v. State, No. 99-2-27054 (filed Nov. 18, 1999); Vashon-Maury Community Council v. State, King County No. 99-2-27694-9 (filed Nov. 29, 1999); City of Bainbridge Island v. State, King County No. 00-2-00048-4SEA (filed in Thurston County Nov. 30, 1999, transferred to King County); Tacoma Water v. State, King County No. 00-2-00049-9 (filed in Thurston County Dec. 17, 1999, transferred to King County); PUD No. 1 of Snohomish County v. State, King County No. 00-2-01137-7 (filed in Thurston County Dec. 23, 1999, transferred to King County); Port of Whitman County v. State, King County No. 00-2-01097-4SEA (filed Jan. 12, 2000); and Puget Sound Clean Air Agency v. State, King County No. 00-2-02023-6 (filed Jan. 21, 2000).
[3] In Citizens for Financially Responsible Gov't v. City of Spokane, 99 Wash.2d 339, 351, 662 P.2d 845 (1983), for example, the court said that the issue of the right of referendum over taxing ordinances in the face of the Spokane City Charter, and comparable situations, were matters of continuing and substantial interest and one presenting a question of a public nature which is likely to recur, and therefore even if amendment of the ordinance at issue rendered the case moot, review was proper.
[4] In any event, it is clear that most, if not all, of the respondents have standing and their claims are justiciable. As a practical matter, our rulings on the constitutionality of I-695 will apply to all respondents.

As noted, we have held that the question of a plaintiff's right to sue under the Declaratory Judgments Act is a question of jurisdiction, which may be raised at any time. Wash. Beauty Coll., Inc. v. Huse, 195 Wash. 160, 80 P.2d 403 (1938); see also, e.g., Kitsap County v. City of Bremerton, 46 Wash.2d 362, 366, 281 P.2d 841 (1955); Galvin v. State Tax Comm'n, 56 Wash.2d 738, 743, 355 P.2d 362 (1960). However, courts in other jurisdictions are split on the question whether standing in a declaratory judgment action is a jurisdictional question that can be raised at any time. Some courts hold that it is. E.g., Prudential-Bache Sec., Inc. v. Comm'r of Revenue, 412 Mass. 243, 248, 588 N.E.2d 639 (1992); Citizens Ins. Co. of America v. Leiendecker, 962 S.W.2d 446, 449 (Mo.Ct.App.1998); Gorman v. Gorman, 966 S.W.2d 858, 864 (Texas App.1998). Other courts have held in declaratory judgment actions that standing will not be considered for the first time on appeal. E.g., City of Tucson v. Woods, 191 Ariz. 523, 526 n. 2, 959 P.2d 394 (Ariz.App.1997); Gasoline Marketers of Vt., Inc. v. Agency of Natural Res., 739 A.2d 1230, 1233 n. 3 (Vt.1999); County of Butler v. Local 585, Serv. Employees Internat'l Union, 744 A.2d 338, 342 n. 4 (Pa.Cmwlth.1999).
Some courts addressing standing have noted the importance of the standing doctrine to assure that a court does not render advisory opinions which may encroach on the authority of other branches of government. Thus, the separation of powers doctrine has served as a constitutional underpinning to the standing doctrine which has led courts to conclude that standing is a matter which, whether viewed as a component of jurisdiction or justiciability, may be raised for the first time on appeal. E.g., Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 444-45 (Tex.1993) (in context of declaratory judgment action); (Terracor v. Utah Board of State Lands & Forestry, 716 P.2d 796, 799 (Utah 1986); City of Indianapolis ex rel. City-County Council v. Ind. State Bd. of Tax Comm'rs, 261 Ind. 635, 637-38, 308 N.E.2d 868 (1974)). This court alluded to the same concern in the case in which it determined that the Declaratory Judgments Act is constitutional. Acme Fin. Co. v. Huse, 192 Wash. 96, 101-02, 73 P.2d 341 (1937).
However, we have held that outside the context of the Declaratory Judgments Act, standing is an issue that must be raised in the trial court. E.g., Baker v. Teachers Ins. & Annuities Ass'n Coll. Retirement Equity Funds, 91 Wash.2d 482, 484, 588 P.2d 1164 (1979); Tyler Pipe Indus., Inc. v. Dep't of Revenue, 105 Wash.2d 318, 327, 715 P.2d 123 (1986), vacated on other grounds, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987). In addition to constitutional questions, the Declaratory Judgments Act authorizes courts to declare private rights, such as the validity or construction of deeds, wills, and contracts. In such contexts, there is little cause for concern about encroachment on the powers of the other branches of government. However, we need not resolve the issue in this case and will leave for a future case, with proper briefing, the question whether we will retain the rule that standing may be raised for the first time on appeal in any, or all, declaratory judgment actions.
[5] In the trial court, the Campaign offered evidence of a poll taken which it claimed showed that logrolling did not in fact occur in this case because 65 percent of those polled supported I-695 and 73 percent supported the voter approval provision. The trial court said that even assuming the validity of the poll, it could still not be determined whether the $30 license fee provision or the voter approval provision or both would have been approved. The Campaign says it is not logrolling to include related and equally popular sections. First, there is no requirement that a challenger alleging a violation of art. II, § 19 show that there has been logrolling in fact. Second, there is no basis for determining whether the September 1999 KOMO-TV-Eastside Journal poll, Clerk's Papers at 207, accurately reflected voter opinion when I-695 was voted on.
[6] Vashon-Maury joins Amalgamated Transit's arguments on all issues.
[7] The meaning of the term tax is addressed in the next section discussing whether I-695 violates the subject-in-title requirement of art. II, § 19.
[8] Amicus League of Women Voters also argues in this part of its brief that there is no rational unity between limiting license tab fees and establishing a method of approval for all tax increases. However, Yelle, 32 Wash.2d 13, 200 P.2d 467, concerns a restrictive title, and where a restrictive title is used, the rational unity analysis does not apply.
[9] However, where the Legislature removes a provision from a bill by amendment, but a reference to that provision continues to appear in the title, no violation of art. II, § 19 occurs. Brower v. State, 137 Wash.2d 44, 71, 969 P.2d 42 (1998); State v. Carroll, 81 Wash.2d 95, 102, 500 P.2d 115 (1972).
[10] At oral argument the Campaign argued that the ballot title also uses the term fees, and not just the term taxes. However, the title quite expressly links the voter approval provision solely to taxes. Fees are mentioned in the title solely with regard to license tab fees: Shall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed? Voters Pamphlet at 4.
[11] These include: RCW 82.44.110; RCW 82.44.150; RCW 82.44.155; RCW 82.44.157; RCW 82.44.160; RCW 82.44.170; RCW 82.44.180; and RCW 82.44.900.
[12] These statutes include RCW 82.44.015; RCW 82.44.022; RCW 82.44.023; and RCW 82.44.025.
[13] Article II, section 1(b) grants the Legislature discretionary authority to refer measures it passes to the people. Brower v. State, 137 Wash.2d 44, 56, 969 P.2d 42 (1998). Section 2 does not permit any discretion on the part of the Legislature to refer tax measures to the people.
[14] The State contrasts this situation with that in California, where the people through the initiative power may bind future legislative bodies, citing Rossi v. Brown, 9 Cal.4th 688, 889 P.2d 557, 574, 38 Cal.Rptr.2d 363 (1995). Under the California State Constitution, a measure enacted by initiative is subject to amendment or repeal only through the initiative process.
[15] The Massachusetts Constitution has subsequently been amended to provide for initiative and referendum. See Massachusetts Constitution Amendment XLII (1913) (superseded 1918) and Amendment XLVIII (1918).
[16] Article I, section 1 states in full that [a]ll political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.
[17] This reasoning would undercut the appellants' argument that the voter approval provision does not involve direct legislation. Many courts have viewed voter approval as involving legislative authority.
[18] If such referenda had been permitted, there would have been no need for adoption of the Seventh Amendment.
[19] We do not wish to leave the impression that, absent the constitutional infirmities under art. II, §§ 1, 19 and 37, section 2 would be valid as to voter approval for all local tax measures. There may be circumstances where a local voter approval provision would not pass constitutional muster for reasons other than addressed in this opinion.
[20] The Campaign also contends that I-695 is supplementary because it does not purport to amend existing statutes, and therefore the text of all statutes affected need not be set forth. A supplementary law is one which adds to, but does not alter, an existing act. State ex rel. Living Serv., Inc. v. Thompson, 95 Wash.2d 753, 757, 630 P.2d 925 (1981). The Tacoma Water respondents maintain, though, that contrary to the State's and the Campaign's characterization of I-695 as an overlay, it does not merely overlay existing statutes, but instead alters them. Respondents appear to be correct; I-695 is not a supplementary law, as it alters a number of existing statutes.
[21] Amalgamated Transit says that I-695 is not complete because the only way to understand the meaning of section 3 is to look at each of the statutes it repeals. However, that is always true when laws are repealed. Given that an act need not set forth statutes on the same subject it repeals, Amalgamated Transit's premise is false. Amalgamated Transit also says that the substantive repeal of the MVET occurred in section 3 alone, and this kind of substantive repealer is subject to art. II, § 37. This conclusion is unsound. By setting vehicle license tabs at $30, section 1 of I-695 eliminated the MVET.
[1] Apprendi v. New Jersey, 530 U.S. ___, 120 S.Ct. 2348, 2367, 147 L.Ed.2d 435 (2000) (Scalia, J., concurring).
[2] See Island County v. State, 135 Wash.2d 141, 155-70, 955 P.2d 377 (1998) (Sanders, J., concurring).
[3] The majority's maxim seems inconsistently applied to those measures which restrict or hamper governing authority when contrasted to those which expand governing authority at the expense of private interests. Cf. Gerberding v. Munro, 134 Wash.2d 188, 212-31, 949 P.2d 1366 (1998) (Sanders, J., dissenting) ("[W]ere we to measure the majority [opinion which struck down the term limits initiative] by its own yardstick, it would most surely fall short." Id. at 214-15 n. 16, 949 P.2d 1366.).
[4] The word "dicta" means observations or remarks made in pronouncing an opinion concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination. State ex rel. Lemon v. Langlie, 45 Wash.2d 82, 89, 273 P.2d 464 (1954). Statements that constitute "obiter dictum" need not be followed. DCR, Inc. v. Pierce County, 92 Wash.App. 660, 683 n. 16, 964 P.2d 380 (1998) (citing State v. Potter, 68 Wash.App. 134, 150, 842 P.2d 481 (1992)).
[5] "When these ghosts of the past stand in the path of justice, clanking their mediæval chains, the proper course for the judge is to pass through them undeterred." Lord Atkin, House of Lords, in United Australia, Ltd. v. Barclays Bank, Ltd., 4 All E.R. 20, 37 (1940).
[6] This inquiry is separate and distinct from the sufficiency of the title, notwithstanding the majority's unfortunate tendency to conflate the two. See, e.g., Majority at 781-783, 786.
[7] Statements in the official voters pamphlet "may be considered to ascertain the collective purpose and intent of the people." State v. Thorne, 129 Wash.2d 736, 763, 921 P.2d 514 (1996). Nonetheless, the majority reaches its conclusion "regardless of what is in the voters pamphlet or the history of the initiative...." Majority at 783-784.
[8] Even the majority references the test as "the rational relationship inquiry." Majority at 783-784.
[9] One scholar who studied the application of the single subject rule to California initiative measures specifically included "[c]ombining a property tax limitation with restrictive procedures for raising other taxes," as reasonably related "coalition-building" under the single subject analysis. Daniel H. Lowenstein, California Initiatives and the Single-Subject Rule, 30 U.C.L.A. L.Rev. 936, 960-61 (1983).
[10] At the time I-695 was drafted, former RCW 29.79.040 (Laws of 1993, ch. 256, § 9) permitted the Secretary of State only 25 words for the ballot title.
[11] At that time, former RCW 29.79.040 (1965) imposed a 100-word limit on ballot titles. Fritz, 83 Wash.2d at 288, 517 P.2d 911.
[12] The majority states: "Further, the specific list of charges which are defined as taxes in subsection 2 includes `license fees.' The average informed voter would not conclude that the charge for a state nurse's license, for example, is a `tax' in its traditional sense." Majority at 786-787. I lack the majority's confidence, however, since this court concluded a business "license fee" when calculated by the number of apartment units was a "tax" in Harbour Village. In none of the cited cases did we allow our tax inquiry to simply end with the label affixed by the governing authority, which is to say the "common meaning" of tax is much broader and less definite than that required at the conclusion of a lengthy legal analysis.
[13] Majority at 794 (citing Belas v. Kiga, 135 Wash.2d 913, 920, 959 P.2d 1037 (1998)).
[14] The majority itself relies upon Justice Cooley's insights at 800-801. See, e.g., Harbour Vill. Apartments v. City of Mukilteo, 139 Wash.2d 604, 611, 989 P.2d 542 (1999); Weden v. San Juan County, 135 Wash.2d 678, 712, 958 P.2d 273 (1998); State v. Bone-Club, 128 Wash.2d 254, 259, 906 P.2d 325 (1995); In re F.D. Processing, Inc., 119 Wash.2d 452, 463, 832 P.2d 1303 (1992); Southcenter Joint Venture v. Nat'l Democratic Policy Comm., 113 Wash.2d 413, 421, 780 P.2d 1282 (1989); Diversified Inv. P'ship v. Dep't of Soc. & Health Servs., 113 Wash.2d 19, 28, 775 P.2d 947 (1989).
[15] As the state points out, this court has carefully dissected statutes in an effort to implement legislative intent expressed through a severability clause. In Caritas Servs., Inc. v. Dep't of Soc. & Health Servs., 123 Wash.2d 391, 416-17, 869 P.2d 28 (1994), we held a retroactive provision unconstitutional but refused to declare the entire act unconstitutional, choosing instead to "strike out the retroactive references," and remanding to the trial court for "bracketing of the severable portions" of the act. The severability clause construed in Caritas is identical to the one the majority construes today to reach its vastly different result. Compare I-695, § 5, to 123 Wash.2d at 416, 869 P.2d 28.